STATE of Wisconsin, Plaintiff,

v.

STATE FARM FIRE & CASUALTY COMPANY, a foreign corporation, Defendant,

Gregory GILLMEISTER, d/b/a Custom Carpet Service, Defendant-Respondent,

Robert W. JOHNSON, d/b/a National Carpet Company, Defendant and Third-Party Plaintiff-Appellant,

John BOSSHARD, d/b/a Bosshard, Sundet & Associates, Appellant-Respondent,

LOWY DISTRIBUTORS and Diamond Rug & Carpet Mills, Inc., Third-Party Defendants-Respondents.

Supreme Court

*No. 79–1492. Argued January 5, 1981.—Decided March 3, 1981.*
(Also reported in 302 N.W.2d 827.)

For the appellant there were briefs by *Janet A. Jenkins* and *Bosshard, Sundet & Associates* of La Crosse, and oral argument by *Janet A. Jenkins*.

For the respondents there was a joint brief by *John H. Drew* and *Steele, Klos & Flynn* of La Crosse, for Lowy Distributors; *John J. Perlich* of La Crosse, for Gregory Gillmeister; *Richard J. Langer, Richard L. Newman* and *Koritzinsky, Neider, Langer & Roberson* of Madison, for Diamond Rug & Carpet Mills, Inc., with oral argument by *John H. Drew, John J. Perlich* and *Richard Langer*.

COFFEY, J.   This is an appeal from that part of the judgment of the circuit court for La Crosse county, the HON. PETER G. PAPPAS, presiding, awarding costs and attorneys' fees to Gregory Gillmeister, d/b/a Custom Carpet Service, Lowy Distributors and Diamond Rug & Carpet Mills, Inc. (respondents), against Robert W. Johnson, d/b/a National Carpet Company (defendant) and Attorney John Bosshard of the law firm of Bosshard, Sundet & Associates, jointly and severally, under the frivolous claims and counterclaims statute, sec. 814.025,

Stats. This case arose out of a claim of a breach of contract on the part of Robert W. Johnson who contracted to sell and install certain carpeting on the University of Wisconsin-Stout campus and is before this court on certification from the court of appeals.

On February 6, 1975, Johnson, the sole proprietor of the National Carpet Company in La Crosse, Wisconsin, was engaged in the retail sale of carpeting and submitted a bid for the sale and installation of carpeting at four residence halls on the University of Wisconsin-Stout campus. Johnson was awarded the contract for the carpeting as the low bidder. The contract provided that Johnson furnish and completely install "Diamond Mark V"[1] carpeting manufactured by the Diamond Rug & Carpet Mills (Diamond), in various areas of certain residence halls in accordance with the specifications and carpet location floor plan drawings. This type of carpeting was represented by Diamond to meet the state's specifications.[2] The contract detailed the specifications for the carpeting as well as the installation procedures in part as follows:

---

[1] The agreement originally specified a type of carpeting known as "Sensation 64" also manufactured by Diamond, but "Diamond Mark V" was later substituted by agreement with the consent of the purchaser for "Sensation 64" as the latter type of carpeting was no longer available.

[2] The contract set forth the following relevant specifications:

"Carpet Specifications:

Type: Sensation 64 [Diamond Mark V] by Diamond Carpet and Rug Mills

Color: Space-dyed for superior color fastness

Width: 12 ft.

Primary Backing: 3.8 oz. polyproplene ofefin [sic]

Secondary Backing: 38 oz. High Density rubber

Yarn Weight: 28 oz. (FHA minimum for this type of area)

Adhesive: To be type recommended by manfacturer of carpet used."

"1. The contractor shall provide all items, materials, operations, or methods listed, and/or herein specified, including all materials, equipment and incidentals necessary and required for the completion of this installation.

"2. **General:** Any material ultimately furnished that in the opinion of the owner is not equal to the approved samples, will be rejected and shall be promptly replaced at no additional cost to the owner.

". . . manufacturer's recommendation for use of seam cement must be strictly followed. Adhesive furnished by carpet manufacturer must be approved waterproof latex base type and must be used to completely compression bond all seams in their continuous full length.

"4. **Installation:**

"A. Carpeting: To be installed using adhesive specified and as recommended by adhesive manufacturer. Use notched trowel, 1/8″ by 1/8″ gauge, to apply adhesive.

"B. Cap Strips: Use cap strips where floor material comes under door. Locate strips directly under doors. Install as recommended by manufacturer.

". . .

"D. There shall be no end seams in any of the cube living areas; minimum of end seams will be allowed where cube areas (student room hallways) meet public area floor lounges.

"E. Where areas are presently carpeted, old moldings are to be removed and new carpet is to be compression seamed to old carpet. Such seams are to run in the same direction of the old carpet (see attached diagram).

"G. Regarding the main floor lounge (Rooms 102, 103, and 118 on diagram) carpet is to run in an east-west direction; maximum of 5 seams. On any exposed carpet edges areas such as steps, doorways, entryways, etc. edges to be capped with molding as described in 4, B.

"H. . . . All seams shall be butted as far as practical so as to be unnoticeable. Trimming and fitting shall be done without revels or sprouts. No piece smaller than equivalent to one (1) square yard will be permitted in this work.

". . .

"J. **Workmanship:** Installation to be by skilled workmen in good workmanlike manner and up to the highest standards of the Carpet Layers Union. Any defect in workmanship which occurs within one year of the com-

pletion date must be corrected at the expense of the successful bidder."

Johnson submitted a purchase order for 2,266 square yards of Diamond Mark V quality carpeting to Lowy Enterprises, Inc., of Minneapolis, Minnesota (Lowy) and assigned the proceeds of the contract to Lowy as security for payment. Johnson hired Gregory Gillmeister, d/b/a Custom Carpet Service, to install the carpet. Installation of the carpeting was completed in early August of 1975 and the state made payment to Lowy, pursuant to the assignment. Johnson's involvement in the installation of the carpeting was that of a general contractor as he only sporadically supervised Gillmeister's work.

Shortly after the job was completed, U.W.-Stout Housing Director Allen Klink observed several problems with the carpeting, *i.e.,* mismatched dye lots, seams bubbling up, separating and pulling apart, as well as the carpeting coming up from the floor at the corners and edges. Klink, upon completion of the work in August and through the following February, made several unsuccessful attempts to contact Johnson and, after finally reaching him, advised him of the problems concerning the carpeting and tried to persuade him to take steps to correct the problems, but Johnson failed to do so. At this time, Johnson was bidding on other carpeting jobs with the State University System and specifically had submitted bids for carpeting jobs on the U.W. campuses at River Falls and Superior. Even though Johnson had submitted the low bid on the River Falls job, his bid was rejected by the University System's purchasing agent, Allen Hickox, who detailed his reason for the rejection in a letter dated August 27, 1975:

"Dear Mr. Johnson:

"I am sorry to inform you that we cannot award your company the River Falls carpeting contract resulting

from our Sealed Bid Inquiry #HA–6441 and your quotation dated August 11, 1975.

"Due to a recent letter detailing several complaints against your company, and telephone calls from two others with an irritating problem, we feel that it is in the best interest of the University of Wisconsin-River Falls to award this contract to the next low bid.

"We do not question your competence or integrity, but feel that you have overextended your company beyond its capability. Further consideration for future contracts will be dependent upon the successful completion and follow through on those contracts which are now pending with National Carpet Company."

In a letter dated August 28, 1975, Hickox returned Johnson's bid on the U.W.-Superior job unopened, stating:

"Dear Mr. Johnson:

"I am returning herewith your apparent quotation to our Sealed Bid Inquiry #HA–6456. Please note that the envelope attached has not been opened.

"As I indicated in my letter to you dated August 27th, we shall not award any further contacts [sic] to your company until the existing contracts are successfully completed."

Despite the statement in Hickox's (the University's purchasing agent) letters that Johnson's bids on the U.W.-River Falls and Superior carpeting jobs were rejected because of Johnson's failure to successfully complete his existing contracts with the state, Johnson continued to ignore requests to rectify the problems at Stout. Subsequently, Klink, on December 31, 1975, requested Myrle Lehman's, the U.W.-Stout purchasing agent, aid in resolving the carpeting problem. Lehman, on March 3, 1976, advised Johnson by letter in part as follows:

"Judging from past performances it appears to me that you intend to do nothing about correcting the prob-

lems in HKMC[3] or even attempting to contact either Mr. Klink or Mr. Albrecht to see if some kind of compromise can be worked out regarding this bad situation. I, as Purchasing Agent, can't force you to remedy this situation without recourse of Court action, so I will have to take the next step which will be a fervent recommendation to the Bureau of Purchases requesting that you and your company be removed from our bid list and barred from all future contract awards by the State of Wisconsin."

A copy of Lehman's letter to Johnson was forwarded to the University System's purchasing agent, Hickox, who likewise urged Johnson to take remedial action by letter dated March 9, 1976:

". . . Needless to say, we do expect you to quickly and favorably respond to correct the many reported problems.

"Should you fail to satisfactorily take care of these complaints, we will have no recourse other than to refer the entire matter to our legal department."

Shortly thereafter, Johnson arranged a meeting between Klink and the other Stout officials and Pat Clinton, a sales representative from Lowy, to inspect the carpeting at the four residence halls. Johnson testified that at the time of the inspection, he observed seam separation, pilling,[4] sprouting[5] and delamination.[6] Johnson's opinion was that the inferior quality of the carpeting was the cause of the seam separation, delamination and other carpeting problems. Johnson and the other parties agreed to having the carpet tested as he believed the carpet did not meet the purchase order specifications.

---

[3] "HKMC" refers to the four residence halls, Hansen, Keith, Milnes and Chinnock, where the carpeting was installed on the U.W.-Stout campus.

[4] Pilling is the separation of a strand of yarn in the joining of another strand of yarn causing a "pill ball."

[5] Sprouting is a condition of unlevel tufts in a level loop carpet.

[6] Delamination in this context refers to the separation of the rubber backing from the carpet's surface.

Johnson did nothing further to resolve the carpet problems setting forth his reasons in a letter to Klink dated June 1, 1976:

"National Carpet Company must refuse to pay for labor (installation) of replacement carpet which would be given by Diamond Carpet Mills-Lowy Distributors to repair the problem at HKMC for *basically* the following two reasons:

"(1) We *cannot* at this writing be assured of the quality of the existing carpet installed in HKMC i.e. specifications.

"(2) If there is in the final analysis negligent installation—which I seriously doubt, I'm afraid it will require an action by the state (which is unfortunate) to resolve this problem."

The state was unable to convince Johnson to solve the carpeting problems and was thus forced to hire another carpet installer to repair the seams, pilling, sprouting and delamination of the carpeting. On June 9, 1978, the state commenced an action against Johnson, his insurance carrier, and Gillmeister to recover $3,656.12, the asserted cost of the repair.

The complaint alleged that Johnson breached his contract in five respects: (1) by failing to provide the quality of carpeting specified; (2) failing to use seam sealer; (3) using excessive seams in certain areas; (4) providing mismatched dye lots; and (5) failing to correct defects in workmanship that occurred within one year of the completion date. The complaint further alleged that Gillmeister was negligent in installing the carpeting in that he failed to install it in a good, workmanlike manner.

Attorney Kenneth Peterson answered on behalf of Johnson denying responsibility for the state's damages and cross-claimed against Gillmeister seeking contribution or indemnification. In his cross-complaint, Johnson also alleged that Gillmeister's negligence in installing the

carpeting caused Johnson to suffer business losses including his credit reputation and his carpeting business.[7] On November 13, 1975, Johnson filed a third party complaint against Lowy and Diamond alleging that they furnished defective carpeting and failed to meet the quality described in the purchase order specifications, and therefore the carpeting was not fit for the purpose intended, *i.e.*, use in a public place (residence halls). Further, Johnson alleged that Lowy negligently failed to inspect the carpeting to determine whether or not it was fit for the use intended as set forth in the contract (purchase order).[8] The third party complaint also asked for contribution or indemnification should the state be successful, and requested damages in the amount of

[7] The loss of business, etc., allegation in the cross-claim was as follows:

"That following the manufacturing, selling, and installation of said carpeting at the aforementioned location, complaints were noted and no further job opportunities which, Robert W. Johnson, relied on were forth coming; that since that period of time, Robert W. Johnson [sic] credit rating has suffered substantially; that because of the negligence of . . . Gregory Gillmeister, defendant, Robert W. Johnson was forced to abandon his chosen profession of the sale and installation of carpeting, all to the damage of Robert W. Johnson in the sum of $200,000.00."

[8] Johnson's claims against Diamond and Lowy provided:

"The said Third Party Defendant, Lowy Distributors:

"a. Carelessly and negligently furnished, with knowledge that it would ultimately be used in a public place, carpeting which was defective and unsafe when used for the purpose for which it was intended.

"b. Carelessly and negligently failed to inspect and examine said carpeting to determine whether or not it was defective and unsafe for the use for which it was intended.

"The Third Party Plaintiff was furnished carpeting distributed by Third Party Defendant, Lowy Distributors and manufactured by Third Party Defendant, Diamond Rug & Carpet Mills, Inc. The carpeting in question was found to be defective and did not meet the specifications and quality represented by the Third Party Defendant, Lowy Distributors and requested by Third Party Plaintiff, Robert W. Johnson."

$200,000 for loss of business and loss of credit reputation.[9]

On January 8, 1979, just six weeks before trial and some two months after the third party complaint was filed, John Bosshard, of the law firm of Bosshard, Sundet & Associates, was substituted for Kenneth Peterson as Johnson's attorney of record. At this time, Bosshard, recognizing the immediacy of the trial date, requested the court to grant an adjournment, but the court denied the same. On January 22, 1979, the court held a pre-trial conference and granted Diamond's motion to dismiss Johnson's third party complaint for failure to state a cause of action reciting a claim against Diamond. At this time, Attorney Jeffrey Knickmeier of the law firm of Bosshard, Sundet & Associates, acting for Johnson, asked for leave to amend his (Attorney Peterson's) third party complaint and the court granted this request. During the course of this pre-trial conference, the trial court was advised that the third party defendants and Gillmeister offered to settle the state's claim without any payment on the part of Johnson, conditioned upon the agreement that Johnson dismiss his cause of action and claim against them for loss of business, profits, credit and general standing in the community. Johnson refused to dismiss this claim even though his attorneys urged and recommended acceptance of the settlement and they

---

[9] The loss of business allegation in the third-party complaint was substantially identical to Johnson's loss of business allegation in his cross claim against Gillmeister:

"That following the manufacturing, selling and installation of said carpeting at the aforementioned location, complaints were noted and no further job opportunities which Robert W. Johnson relied on, were forthcoming; that since that period of time, Robert W. Johnson's credit rating has suffered substantially; that because of the negligence of both Third Party Defendants, Third Party Plaintiff, Robert W. Johnson, was forced to abandon his chosen profession of the sale and installation of carpeting, all to the damage of Robert W. Johnson in the sum of $200,000.00."

further advised him that his cause of action and claim for loss of business, credit and reputation were questionable.

Shortly after the pre-trial conference, Johnson revealed at a deposition hearing that his sales tax permit, a prerequisite for engaging in the business of retail sales of carpeting in Wisconsin,[10] was revoked in 1977 as a result of his failure to pay a $5,000 sales tax. The record establishes that Attorney Jeffrey Knickmeier, representing Johnson at the deposition hearing, was aware of the revocation of his sales permit in 1977.

After the pre-trial conference, Johnson filed an amended third party complaint, containing the following additional allegations against Diamond and reducing the alleged damages from $200,000 to $50,000:

"That the Defendant, Diamond Rug & Carpet Mills, Inc. did manufacture the aforesaid carpeting, known and referred to as "Diamond Mark V", and that said carpeting was defectively manufactured, was of inferior quality, and failed to meet proper specifications. That said carpet was improperly dyed, was of insufficient weight, did not have sufficient ply of pile, was subject to rapid wearing, and was of inadequate lamination strength.

"That the manufacture and distribution of said carpet constitutes a breach of both implied and expressed warranties, in that the carpet did not meet the advertised and guaranteed standards; that said carpet was unfit for its foreseeable and intended purpose, and did not meet the recognized standard of the industry.

"That said warranties, express and implied, extended to Third Party Plaintiff, Robert W. Johnson, and that the negligent manufacture and distribution of said carpet did proximately and foreseeably result in great and substantial damage to Third Party Plaintiff, Robert W. Johnson, including loss of business and profits, loss of credit and general standing in the community, and caused said Robert W. Johnson to be sued by the State of Wisconsin and necessitated replacement and repair of the

---

[10] See: sec. 77.52 (1) and (7)–(13), Stats.

aforesaid defective carpeting, all to Robert W. Johnson's great and substantial damage."

Before trial, the court denied Diamond's motion to dismiss the amended third party complaint and ordered the case proceed to trial.

At the jury trial, Hickox (University Systems purchasing agent), Klink (housing director) and the Lowy's sales representative examined the carpeting and opined that the seam problems resulted from faulty, substandard and poor workmanlike installation. Klink further explained that the reason for the color variation was that a second order came from a different dye lot (different production run) which was caused by an insufficient amount of carpeting yardage specified in the original order. Klink also testified that the reason for the excessive amount of seams was Johnson's failure to properly lay out and measure the area to be carpeted and consequently the carpet had to be pieced.

John Cooley, national sales manager for Diamond, stated that the carpet seam problems at Stout were caused by faulty, poor and unacceptable installation and further that no seam sealer had been used in any of the seams inspected. He also testified that the job was laid out poorly in that small pieces necessitating seams were used in high traffic pattern areas, thus causing seam separation. Cooley further stated that the problems would not have occurred if the area had been properly measured and diagramed, the carpet laid out properly and properly installed with adequate seaming, edging and sealing.

Johnson confirmed Klink's testimony that his original purchase order for only 2,266 square yards of carpeting was 19 square yards short as the job area required 2,285 square yards. However, Johnson denied that the seam problems were caused by faulty lay out, measurement and installation, but claimed that they (seam problems)

were caused by the delamination of the seam bond and the poor quality of the carpet. In his testimony, Johnson stated that he did not comply with the state's demands to correct the problems because the results of an independent carpet test performed at the state's request revealed that the carpeting did not meet the specifications recited in the purchase order[11] and he believed that the failure of the carpeting to meet the specifications was the underlying cause of the problems. However, Johnson produced no witness qualified to support his theory of the cause of the carpet problems and thus the court held the test results inadmissible because:

". . . there has been, based on the testimony which has been adduced at least to this point, that there is no relationship between the testing and so far the claims or cause and the State's cause of action, nor is there any relationship to the allegation made in the third party complaint. So for that reason it becomes irrelevant."

The testimony relating to Johnson's alleged damages and his removal from the state's bid list was given by Johnson and Mr. Hickox. Hickox testified that he rejected Johnson's low bid for the River Falls contract and did not even consider Johnson's bid on the Superior job because of the problems experienced at Stout which he understood were caused by faulty installation. Additionally, Hickox's letters informing Johnson of these decisions

[11] The pertinent test results revealed the carpeting did not meet the ply of pile and carpet weight specifications:

| Test Conducted | Test Results as to Color of Carpet | | Requirements Recited in Purchase Order |
| --- | --- | --- | --- |
| | Blue | Orange | |
| Ply of Pile | 1 | 1 | 2 |
| Weight–ozs./sq. yd. | | | |
| Total | 78.3 | 81.2 | — |
| Pile | 23.0 | 23.0 | 28.0 |
| Foam Rubber | 27.2 | 29.2 | 38.0 |

stated that he would not award Johnson any future contracts in the following language:

". . . we shall not award any further contact [sic] to your company until the existing contracts are successfully completed."

As a result of the state's action, Johnson testified that he suffered an estimated loss of $1,000 from the rejection of the River Falls bid. He further testified that the reason for the financial failure of his carpeting business was his inability to maintain sufficient working capital due to his loss of the state's business. The record demonstrates that a majority of Johnson's business involved supplying carpeting to the state. At the time of trial (February, 1979), when asked why he was not selling carpeting, Johnson answered that his sales permit had been revoked in 1977 as a result of his failure to pay a delinquent sales tax lien, some two years after he lost the state's business in August of 1975.

At the close of Johnson's evidence, the court granted Diamond and Lowy's motion for dismissal of the third party complaint on the grounds of insufficiency of evidence. Counsel for Lowy, Diamond and Gillmeister (respondents) then moved for a judgment for costs and attorneys' fees, pursuant to sec. 814.025, Stats., claiming that Johnson's cross-claim and third party complaint for "loss of business and profits, loss of credit and general standing in the community," were frivolous under subsec. (3) (b) of the statute. Counsel for Gillmeister and the third party defendants limited their motion for costs and attorneys' fees to the defense of Johnson's loss of business and profits claim, but admitted that Johnson's claims against them for contribution were not frivolous.

The circuit court, after listening to the arguments of counsel, granted the sec. 814.025, Stats., motion for costs and attorneys' fees, ruling that Johnson and Bosshard

were jointly and severally liable for the same. Subsequently, the state's breach of contract claim was settled for $2,300 with Lowy, Diamond, Gillmeister and Johnson, each paying $500.00, and Johnson's insurer contributing $300.00.

After trial, on June 7, 1979, the court held a hearing to determine the amount of costs and attorneys' fees to be awarded and ruled as follows:

"All right, the recovery on behalf of the defendants will be against John Bosshard doing business as Bosshard, Sundet & Associates, and Robert W. Johnson, jointly, in favor of Gregory Gillmeister in the total amount of $1,167.02, with interest from this date.

"Against John Bosshard doing business as Bosshard, Sundet & Associates, and Robert W. Johnson, jointly, in favor of Lowy Distributors, $2,005.36, with interest from this date.

"Against John Bosshard doing business as Bosshard, Sundet & Associates, and Robert W. Johnson, in favor of Diamond Distributors, $2,856.95, with interest from this date."

A subsequent motion to vacate the court's assessment of costs and attorneys' fees, was denied and the court reaffirmed its earlier ruling (June 7th) and entered judgment on August 15, 1979 consistent therewith. Johnson and Bosshard in appealing from this judgment raise a number of issues and the court of appeals certified this case to this court. We limit our discussion to a consideration of the following issue of the frivolous claims and counterclaims statute which we determine to be dispositive.

*Issue*

Did the trial court err in concluding that Johnson and his attorneys knew or should have known that Johnson's cross-claim and third party complaint for "loss of business and profits, loss of credit and standing in the com-

munity," was without any reasonable basis in law or equity and thus frivolous under sec. 814.025 (3) (b), Stats?

The frivolous claims and counterclaims statute was created by ch. 209 of the Laws of 1977, effective April 7, 1978. It provides:

"(1) If an action or special proceeding commenced or continued by a plaintiff or a counterclaim, defense or cross complaint commenced, used or continued by a defendant is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.

"(2) The costs and fees awarded under sub. (1) may be assessed fully against either the party bringing the action, special proceeding, cross complaint, defense or counterclaim or the attorney representing the party or may be assessed so that the party and the attorney each pay a portion of the costs and fees.

"(3) In order to find an action, special proceeding, counterclaim, defense or cross complaint to be frivolous under sub. (1), the court must find one or more of the following:

"(a) The action, special proceeding, counterclaim, defense or cross complaint was commenced, used or continued in bad faith, solely for purposes of harassing or maliciously injuring another.

"(b) The party or the party's attorney knew, or should have known, that the action, special proceeding, counterclaim, defense or cross complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law." Sec. 814.025, Stats.

As noted, the respondents, Diamond, Lowy and Gillmeister, moved for an award of costs and attorneys' fees under the statute claiming that Johnson's cross-claim and third party complaint for loss of business and profits against them was frivolous as that term is defined in sub. (3) (b). They claimed that Johnson's loss of business and profits claim was not reasonably supportable in law

or equity because his carpeting business failed as a result of the revocation of his sales permit in 1977. Further, they asserted the rejection of Johnson's River Falls bid and any loss of the state's business or profits that resulted from the carpeting problems at Stout was due solely to Johnson's failure to take remedial action when requested by the Stout officials.

The circuit court's findings of fact demonstrate that it agreed with the arguments advanced by Lowy, Diamond and Gillmeister with regard to the frivolousness of Johnson's loss of business and profits claim. It stated:

"The evidence at trial conclusively established that after the officials at Stout University contacted Johnson who, other than meeting with them, did absolutely nothing to correct the deficiencies; he made no demand on Gillmeister to correct the work, if that was the cause; he made no effort to get anyone in to correct the deficiencies and that was why the University Wisconsin system refused to allow him to bid on work for the University system.

"Nothing prevented Johnson from doing business with millions of people or thousands of business concerns in Wisconsin or elsewhere except for his loss of his sales tax permit."

Thus, on the basis of these findings, the court concluded that as of January 22, 1979, Johnson and his attorneys knew or should have known that Johnson's claim for loss of business and profits was without any reasonable basis in law or in equity. The court awarded attorneys' fees incurred after January 22, 1979, because that was the date the state's breach of contract claim could have been settled had Johnson agreed to dismiss his loss of business and profits claim and the date that Johnson, in a deposition, disclosed that his sales permit was revoked in 1977.

Initially we note that the record does not support the trial court's findings that "nothing prevented Johnson

from doing business with millions of people . . . except for his loss of his sales permit" as this revocation could only have prevented him from doing business after the date of the revocation in 1977. Thus, any loss of business and profits he suffered during this period of time could not be attributed to the revocation of his sales permit.

Further, we note that a party's refusal to settle a lawsuit is legally irrelevant to show that a claim or defense is frivolous and should not be continued. Refusal to settle does not make it more or less probable that the decision to proceed is unreasonable and, therefore, the fact of refusal to settle is irrelevant. The only relevant fact is that a conscious decision has been made to continue to assert the claim or defense.

In their brief and argument to this court, Diamond, Lowy and Gillmeister contend that Johnson's claim for loss of business and profits was frivolous as it was without any reasonable basis in fact. In making this argument, they characterize Johnson's claim for loss of business and profits as possessing three elements: (1) that Diamond, Lowy and Gillmeister engaged in wrongful conduct (breach of warranty as to the quality of the carpeting and the negligent inspection and installation of the carpeting) ; (2) that such wrongful conduct was a cause of Johnson's loss of business and profits; and (3) that Johnson was in fact damaged as claimed, *i.e.,* he suffered a loss of business and profits. Diamond, Lowy and Gillmeister then attempt to draw a distinction between two types of claims: (1) claims that are unsuccessful as a result of a failure of proof, and (2) claims that, by their very nature, are incapable of proof. They assert that only claims of the latter type are frivolous and that Johnson's request for damages for loss of business and profits was, by its very nature, incapable of proof. However, Diamond, Lowy and Gillmeister do not

assert that all three elements of Johnson's claim for loss of business and profits was incapable of proof. In fact, they concede that Johnson could quite possibly have established the alleged wrongdoing on their part as well as damages stating:

"As to the first element of Johnson's claim [for loss of business and profits] it is conceivable that appellants could have produced evidence that there was some negligence on the part of the respondents. They did not (although they had every opportunity to do so) and this constitutes a failure of proof on the element of negligence . . . Conceivably, appellants could have brought forth an economist, tax returns, or evidence regarding Johnson's loss of profits and business. However, except for the unsupported statements of Johnson himself, there was a failure of proof on the item of damages." Resp. Br. at 53.

The trial court found that the cause of Johnson's loss was his failure to fulfill the terms of the contract with U.W.–Stout as to "his obligations under that contract which he had signed to be responsible for the maintenance and whatever repairs were necessary on this carpeting for a period of one year" and in failing to pay sales tax so as to lose his seller's permit. These findings have not been challenged. However, standing alone, without other proof, these findings do not support the conclusion that Johnson's claim was without a reasonable basis in law or equity. This other proof, under our holding in *Sommer v. Carr*, 99 Wis.2d 789, 299 N.W.2d 856 (1980), is "knowledge or imputed knowledge" on the part of a party or his attorney. (p. 793). This knowledge is to be tested by an objective standard:

"That standard being whether the attorney knew or should have known the position taken was frivolous as determined by what a *reasonable attorney* would have known or should have known under the same or similar circumstances.

"This same objective test can be applied to a 'party' as to the party's attorney, since not all parties will be insurance companies with experienced trained personnel." (p. 799).

Thus, it was the burden of Diamond, Lowy and Gillmeister to show that the decision to pursue Johnson's claim was objectively unreasonable in light of the facts that were known or should have been known at the time the decision to continue the claim was made. This they failed to do.

Knowledge that Johnson had lost his seller's permit standing alone is not knowledge of a fact sufficient to support the objective standard of *Sommer v. Carr, supra.* Diamond, Lowy and Gillmeister were required not only to show that Johnson had lost his seller's permit, but also that if he had been allowed to continue to do business with the State University System he would have been unable to produce sufficient revenues to allow him to pay the deficiencies and retain the permit. No evidence of this nature was offered. Therefore, the only remaining question is whether Diamond, Lowy and Gillmeister carried their burden of proof to demonstrate that a reasonable attorney would have concluded that their actions were not a substantial factor in causing the loss of bidding privileges that Johnson suffered when he was removed from the University System bid list.

The question of whether a reasonable attorney and litigant would or should have concluded that a particular claim is without a reasonable basis in law or equity presents a mixed question of law and fact and not a question of fact alone. In *Department of Revenue v. Exxon Corp.,* 90 Wis.2d 700, 281 N.W.2d 94 (1979), this court commented on the analysis that it must undertake when such questions are presented:

"When mixed questions of law and fact are presented to this court, there are really two component questions

which must be answered. The first question is what, in fact, actually happened; the second question is whether those facts, as a matter of law, have meaning as a particular legal concept. Comment, *The Scope of Judicial Review of Administrative Agency Decisions in Wisconsin,* 1973 Wis. L. Rev. 554 (1973). The question of whether the facts fulfill a particular legal standard is itself a question of law. See *Cheese v. Industrial Comm.,* 21 Wis.2d 8, 15, 123 N.W.2d 553 (1963)." *Id.* at 713.

In the context of this case, the determination of what a reasonable attorney and litigant would or should have known with regard to the facts of the case required the trial court to determine what those facts are, thus a question of fact; but the legal significance of those findings in terms of whether knowledge of the facts highlighted by the circuit court would lead a reasonable attorney and litigant to conclude the claim is frivolous is a question of law, not a question of fact.

Diamond, Lowy and Gillmeister argue that the cause of Johnson's removal from the bid list was his failure to make any effort to correct the carpeting problems at U.W.-Stout, despite the contract provisions that obligated him to remedy any defect in workmanship that occurred within one year after the completion of the carpeting installation. This argument ignores the fact that Johnson was given notice less than a month after completion of the contract (August 27 and August 28, 1975) that his two outstanding bids for carpeting at U.W.-River Falls and Superior campuses would not be considered. There is nothing in the record to show that Johnson had repudiated his contractual obligation to correct installation problems at U.W.-Stout, only three weeks after the installation date, the time those letters were written. In order to satisfy the objective standard of proof mandated in *Sommer v. Carr, supra,* it was necessary for Diamond, Lowy and Gillmeister to show that if Johnson had corrected the deficiencies at U.W.-

Stout, his full bidding privileges would have been re-
stored. No such testimony was received; in fact, the
contents of the letters in question do not purport to as-
sure Johnson that his full bidding privileges would be
continued even after satisfying the University's com-
plaints. The letter of August 27th states the opinion of
Hickox that Johnson had extended his company beyond
its capability. A reasonable attorney might have con-
cluded that even if the Stout contract questions were
resolved, Johnson would no longer be considered for large
carpeting contracts with the state. Thus, the only evi-
dence bearing on the subject shows that the problems
occurring at U.W.-Stout caused the University's purchas-
ing agent to question Johnson's capability to perform a
carpeting job of that size. It was objectively reasonable
to assume that this question as to Johnson's capability
would persist notwithstanding a satisfactory resolution
of the specific complaints in the U.W.-Stout job. In fact,
Diamond, Lowy and Gillmeister never argued that John-
son lacked such capability of performance. Therefore,
if Johnson's claim that negligence on the part of Dia-
mond, Lowy and Gillmeister was the cause of the prob-
lems at U.W.-Stout was capable of proof, his cause of
action against them was not frivolous within the meaning
of sec. 814.025 (3) (b), Stats., as construed in *Sommer
v. Carr, supra.* We have quoted earlier in this opinion
the admission in the brief of Diamond, Lowy and Gill-
meister that Johnson's claim as to negligence was not
incapable of proof, but rather failed for a lack of suf-
ficient proof.

Wisconsin is committed to the "substantial factor"
test of causation in negligence actions, *i.e.,* whether the
alleged negligence is a substantial factor in producing the
claimed injury or damage. *See: Clark v. Leisure Vehicles,
Inc.,* 96 Wis.2d 607, 617, 292 N.W.2d 630 (1980) ; *Samp-*

*son v. Laskin,* 66 Wis.2d 318, 325, 224 N.W.2d 594 (1975), and Wis. JI—*Civil,* No. 1500, and comment thereto. The question of whether the alleged wrongdoing on the part of Diamond, Lowy and Gillmeister was a substantial factor in influencing the state to reject Johnson's River Falls bid and remove him from its bid list, under the facts of this case, is a legitimate question about which competent attorneys and litigants can reasonably disagree. The decision to proceed with this claim was a matter of legal judgment dependent upon the credible evidence that Johnson's attorneys believed they could marshal and introduce into evidence at trial. We refuse to say under the facts in this case that a reasonable attorney and litigant would or should have concluded that they would be unable under any circumstances to elicit testimony from witnesses, including Hickox, to prove that the negligent installation of the carpeting at Stout or the failure to supply carpeting meeting the specifications was a *substantial factor in causing* the removal of Johnson from the state's bid list and the refusal to accept his River Falls bid. Thus, we hold that Johnson's claim for loss of business and profits was not frivolous and so indefensible as to be without any reasonable basis in law or equity under sec. 814.025 (3) (b), Stats. Therefore, a reasonable attorney and litigant could very well determine that it was possible to establish a causal connection between the alleged wrongdoing on the part of Diamond, Lowy and Gillmeister and Johnson's loss of the state's business.

In reviewing this case, we note that the trial court ruled that Johnson and Bosshard were jointly and severally liable for the respondents' attorneys' fees. The appellants argue that the trial court abused its discretion in so ruling because sec. 814.025, Stats., does not authorize the imposition of joint and several liability. We are inclined to agree with the appellants as sec. 814.025 (2)

provides that the court may assess costs and attorneys' fees "so that the party and the attorney each pay a *portion* of the costs and fees." This language expressly provides for an assessment of a portion, or a specified sum, of the costs and attorneys' fees against the party and the attorney and does not allow the court to impose joint and several liability for the same.

*By the Court.*—That portion of the judgment of the circuit court awarding costs and attorneys' fees under sec. 814.025, Stats., is reversed.

HEFFERNAN, J., took no part.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). In ruling on the motion for fees under sec. 814.025, Stats. 1979–80, the trial court found that Johnson "completely ignored his obligations under that contract which he had signed to be responsible for the maintenance and whatever repairs were necessary on this carpeting for a period of one year." The majority notes that this finding is not challenged on appeal. This finding raises the issue which I think the majority does not fully consider, whether "the reasonable attorney" and "the reasonable party" would have concluded that Johnson's claim for loss of profits was foreclosed under the doctrine of contributory negligence or the doctrine of avoidable losses. *See* Prosser, *Law of Torts* sec. 65, pp. 422–424 (4th ed. 1971). Under these doctrines Johnson can be denied recovery for loss of profits because he failed to exercise due care to protect his own interests. The reasonable inference from the record, as I read the record, is that Johnson could have avoided loss of bidding privileges if he had fulfilled his contract obligations, the cost of which was minor compared to the potential harm and the cost of which Johnson could have recovered from the other parties involved.

I believe Johnson's claim for loss of profits rests on a very weak basis. Nevertheless, applying the objective standard set forth in *Sommer v. Carr*, 99 Wis.2d 789, 299 N.W.2d 856 (1981), to the facts in this case, I concur in the decision of the majority.

In *Sommer v. Carr, supra,* the court pointed out a similarity in policy, purpose, and language between the attorney's duties, responsibilities and liabilities under sec. 814.025, Stats. 1979–80, DR 7–102A (1) (a) of the Attorneys Code of Professional Responsibility, 43 Wis.2d xi (1970), SCR 20.36 (1980), and the attorneys oath, sec. 757.27, Stats. 1979–80. This case points out another relation between the attorney's obligations under the Code and his liability under sec. 814.025, Stats. DR 2–109 and DR 2–110, 43 Wis.2d xxx (1970), SCR 20.15, 20.16 (1980), govern the lawyer's acceptance and withdrawal from employment and provide as follows:

"DR 2–109   Acceptance of Employment.

"(A)   A lawyer shall not accept employment on behalf of a person if he knows or it is obvious that such person wishes to:

"(1)   Bring a legal action, conduct a defense, or assert a position in litigation, or otherwise have steps taken for him, merely for the purpose of harassing or maliciously injuring any person.

"(2)   Present a claim or defense in litigation that is not warranted under existing law, unless it can be supported by good faith argument for an extension, modification, or reversal of existing law.

"DR 2–110   Withdrawal from Employment.

"(A)   In general.

"(1)   If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employ-

ment in a proceeding before that tribunal without its permission.

"(2) In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules.

"(3) A lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned.

"(B)   Mandatory withdrawal.

"A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if:

"(1) He knows or it is obvious that his client is bringing the legal action, conducting the defense, or asserting a position in the litigation, or is otherwise having steps taken for him, merely for the purpose of harassing or maliciously injuring any person.

"(2) He knows or it is obvious that his continued employment will result in violation of a Disciplinary Rule.

"(3) His mental or physical condition renders it unreasonably difficult for him to carry out the employment effectively.

"(4) He is discharged by his client.

"(C)   Permissive withdrawal.

If DR 2–110 (B) is not applicable, a lawyer may not request permission to withdraw in matters pending before a tribunal, and may not withdraw in other matters, unless such request or such withdrawal is because:

"(1) His client:

"(a) Insists upon presenting a claim or defense that is not warranted under existing law and cannot be supported by good faith argument for an extension, modification, or reversal of existing law.

"(b) Personally seeks to pursue an illegal course of conduct.

"(c) Insists that the lawyer pursue a course of conduct that is illegal or that is prohibited under the Disciplinary Rules.

"(d) By other conduct renders it unreasonably difficult for the lawyer to carry out his employment effectively.

"(e) Insists, in a matter not pending before a tribunal, that the lawyer engage in conduct that is contrary to the judgment and advice of the lawyer but not prohibited under the Disciplinary Rules.

"(f) Deliberately disregards an agreement or obligation to the lawyer as to expenses or fees.

"(2) His continued employment is likely to result in a violation of a Disciplinary Rule.

"(3) His inability to work with co-counsel indicates that the best interests of the client likely will be served by withdrawal.

"(4) His mental or physical condition renders it difficult for him to carry out the employment effectively.

"(5) His client knowingly and freely assents to termination of his employment.

"(6) He believes in good faith, in a proceeding pending before a tribunal, that the tribunal will find the existence of other good cause for withdrawal."

*See also* EC 2–30 and EC 2–32, 43 Wis.2d xxii (1970), SCR 20.06 (8) (e) (g) (1980).

The lawyer's obligation to comply with the Code and the lawyer's desire to avoid the adverse financial consequences imposed under sec. 814.025 may conflict.

In this case the lawyer urged the client to dismiss part of the client's claim. The client insisted on prosecuting the claim, and the lawyer complied with the client's wishes. Had the court held the claim frivolous, several questions would arise. When the attorney advises the client not to proceed, should the costs and fees be imposed solely on the client and not on the lawyer? If the attorney believes part of the client's claim is frivolous, is he or she compelled to withdraw from employment in order to avoid liability under sec. 814.025? Is the attorney's withdrawal consonant with the attorney's obligations under the Code? The Code of Professional Responsibilities and sec. 814.025, Stats. 1979–80, are in some respects related, but the nature of the relationship is far from clear.