Todd JANDRT, a minor, by his Guardian ad Litem, Larry B. Brueggeman, Kristine K. Kinsley Stoeklen, as Special Administrator of the Estate of Mitchell J. Kinsley, deceased, Tierney Liazuk, a minor, by her Guardian ad Litem, Larry B. Brueggeman, Plaintiffs,

v.

JEROME FOODS, INC., Defendant-Respondent,

Monica JANDRT, Jodi Liazuk and Kristen K. Kinsley Stoeklen, Third-Party Defendants,

PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEG-GEMAN, S.C., Judgment Debtor-Appellant.†

Supreme Court

*No. 98–0885. Oral argument May 6, 1999.—Decided July 7, 1999.*

(Also reported in 597 N.W.2d 744.)

†Motion for reconsideration denied October 28, 1999.

532

535

For the judgment debtor-appellant there were briefs by *Thomas W. St. John, Matthew W. O'Neill* and

*Friebert, Finerty & St. John, S.C.*, Milwaukee and of counsel, *Joe Thrasher* and *Thrasher, Doyle, Pelish & Franti, Ltd.*, Rice Lake and oral argument by *Thomas W. St. John.*

For the defendant-respondent there were briefs by *James R. Troupis, Steven P. Means* and *Michael Best & Friedrich, LLP*, Madison and *David F. Girard-diCarlo, James T. Smith, Laurence S. Shtasel, Lisa A. Rosenblatt-Kaplan* and *Blank, Rome, Comisky & McCauley, LLP*, Philadelphia, PA and oral argument by *James R. Troupis and James T. Smith.*

Amicus curiae brief was filed by *Robert A. Slattery* and *Slattery & Hausman, Ltd.* And *James D. Ryberg* and *Kelly & Ryberg, S.C.*, Eau Claire for the American Board of Trial Advocates.

Amicus curiae brief was filed by *Mark L. Thomsen* and *Cannon & Dunphy, S.C.*, Brookfield and *William C. Gleisner, III* and *Hausmann-McNally, S.C.*, Milwaukee for the Wisconsin Academy of Trial Lawyers.

¶ 1. DONALD W. STEINMETZ, J. This case is before us on certification from the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (1997–98). Debtor-appellant appeals a judgment of the Circuit Court for Barron County, the Honorable Edward R. Brunner.

¶ 2. On May 9, 1995, Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C. (Previant firm) filed this lawsuit on behalf of three children born with birth defects. The lawsuit alleged upon information and belief that the plaintiffs' birth defects were caused by the exposure of their mothers during pregnancy to certain chemicals present and used at Jerome Foods, Inc. (JFI), a turkey processing plant located in

Barron County, where the mothers worked. The causation allegation was made "upon information and belief" because, among other things, the Previant firm was advised by a medical consultant that it would need discovery from JFI concerning the specific chemicals used and levels of exposure before conclusively determining causation. The Previant firm filed the action within one week of a change in the law of joint and several liability that potentially would have a significant impact upon the plaintiffs' recovery should their lawsuit be successful.

¶ 3. Nine months after the action was filed, the Previant firm offered to voluntarily dismiss the action. The Previant firm and its clients had concluded that the causal connection between chemicals at JFI and the plaintiffs' birth defects could only be demonstrated through epidemiological studies, and chose not to commence such an undertaking. JFI then filed a motion seeking sanctions against the Previant firm for allegedly commencing and continuing a frivolous action. After a two-day hearing on the motion, the circuit court filed its memorandum decision which included 118 findings of fact and 74 conclusions of law. The court held that the commencement and continuation of the action was frivolous because the Previant firm failed to make a reasonable inquiry into the facts underlying the allegation of causation prior to and following filing. The circuit court awarded JFI a total of $716,081 in attorneys fees and costs.

¶ 4. Accordingly, the issues presented for review are:

¶ 5. (1) Whether the circuit court applied a proper standard of law and used a demonstrated rationale process in concluding that the filing of this action without proof of causation was frivolous under Wis.

Stat. §§ 802.05 or 814.025. We hold that the circuit court erroneously exercised its discretion in concluding that the commencement of the action was frivolous.

¶ 6. (2) Whether under Wis. Stat. § 814.025 the Previant firm's continuation of the action for nine months was frivolous. We hold that the circuit court did not err as a matter of law in concluding that the action was frivolously maintained.

¶ 7. (3) Whether an award of $716,081 in attorneys fees and costs was reasonable as a matter of law. As we hold that the filing of the action was not frivolous, we remand to the circuit court to determine the amount of reasonable attorneys fees and costs JFI is entitled to as a result of the Previant firm's continuation of a frivolous action.

## I

¶ 8. In November 1994, Larry Brueggeman (Brueggeman), a shareholder with the Previant firm, was contacted by Jonathan Sherman (Sherman), a Wisconsin attorney with whom he had worked in the past. Sherman told Brueggeman that he represented a potential class of children who had suffered birth defects as a result of their mothers' exposure to chemicals at JFI during their pregnancies. Sherman inquired whether Brueggeman would be interested in handling the case on behalf of the plaintiffs.

¶ 9. Brueggeman understood from Sherman's preliminary investigation that between 12 and 15 women had indicated that they had "problem pregnancies" while working at JFI. Sherman had obtained information from some of the mothers who worked at JFI that there had been ammonia leaks and that on occasion the facility had been evacuated. He also had some evidence that the level of carbon dioxide

$(CO_2)$ was such that there was $CO_2$ build-up on the floor and that a number of women had complained of breathing problems, headaches, and dizziness.

¶ 10. Brueggeman also understood that Sherman had run a medical literature search to determine whether there was a relationship between birth defects and chemicals in the environment. Sherman indicated that his office had not located any scientific literature specifically addressing the possible relationship between $CO_2$ or ammonia, two chemicals known to be present at JFI, and birth defects.

¶ 11. Finally, Sherman also provided Brueggeman with a transcript statement made by Jodi Liazuk (Liazuk), the mother of one of the plaintiffs, taken approximately a year after the birth of her daughter in a conversation with Sherman. Liazuk explained that her daughter's neurologist, Dr. Harris, told her that the cause of her daughter's spina bifida could have been chemicals at JFI:

> [Dr. Harris] had asked us where we worked and well, my husband asked him how does this happened [sic] and he said there's there's several different reasons that it can be hereditary it can be caused by chemical pollution, by chemicals you work with and he asked us where did you work because we didn't you know have any idea of anything in the family and we told him where we worked and, what I worked around and he said there's a good cause right there he said that's he says that I could be almost certain almost certain that the chemicals that you worked around and with could have cause [sic] the spina bifida.

¶ 12. In February 1995, Jodi Liazuk and the mothers of the two other plaintiffs' in this suit retained the Previant firm to represent them in this matter. The

540

plaintiffs Tierney Liazuk and Todd E. Jandrt were born with spina bifida. Kristine K. Kinsley Stoeklen was the third plaintiff, the special administrator of the Estate of Mitchell J. Kinsley, who was deceased. Mitchell Kinsley was born with hypoplastic heart malformation.

¶ 13. After its retention, the Previant firm made additional investigation to determine whether a complaint should be filed. Previant firm associate Lisa Bangert (Bangert) and a Previant firm librarian conducted a search of medical and scientific literature regarding the relationship between exposure to ammonia or $CO_2$ and birth defects. They found literature indicating that birth defects can be a result of chemicals in the environment, but were unable to find any literature addressing whether ammonia or $CO_2$, individually or in combination, caused birth defects.

¶ 14. Bangert then examined whether any of the other known causes of spina bifida were present. She interviewed the plaintiffs' mothers, and two of the fathers. Based upon these interviews, she concluded that none of those causes were present, and further concluded that therefore there was a "strong probability" that exposure to chemicals caused the defects.

¶ 15. Brueggeman then consulted with George Dahir, M.D. (Dahir), regarding causation. Brueggeman had in the past relied on Dahir, who serves as a consultant to lawyers in "toxic tort" actions, for help to determine whether or not a causal relationship existed between the exposure to a chemical and the problem of which the plaintiff is complaining. Although not an expert on causation, Dahir had apparently advised Brueggeman on technical issues in similar cases and advises attorneys generally on how best to proceed in

such cases. Brueggeman testified at the sanctions hearing that after he explained the facts known to him, Dahir advised that due to the evolving nature of the science in the area of causation, in order to obtain an expert opinion on causation it would be necessary to commence an action and obtain discovery concerning the nature and extent of the exposure of the plaintiffs to the chemicals at JFI. The Previant firm relied on Dahir's advice and did not contact an expert on causation before it filed the action.

¶ 16. On March 1, 1995, shortly after the Previant firm was retained, the Wisconsin Senate approved Senate Bill 11, which by all accounts made significant changes to the law of comparative negligence. The law was scheduled to take effect on May 17, 1995 (which it did). The Previant firm received a number of "warnings" concerning the potential liability the firm could face if it did not file negligence actions prior to the effective date of the law. For instance, it received an April 10, 1995, practice alert from the State Bar and the Wisconsin Lawyers Mutual Insurance Company (WILMIC). The "Good Practice Alert" issued by the State Bar stated:

> Both defense and plaintiff's counsel need to advise their respective clients of this important deadline which can dramatically affect their client's interests. Whether you are representing carriers or claimants, be alert. The information you provide (or fail to provide your clients) could be a costly omission.

Two weeks later, in an article in the Milwaukee Journal Sentinel, a personal injury attorney, who the Previant firm characterizes as well-known, was quoted as stating that "[a]ny lawyer who has a case where the

remedy might be better under the old law who doesn't file is guilty of malpractice, in my opinion."

¶ 17. The Previant firm based its decision to file on these warnings and one week before the new law was to take effect, it filed this action on behalf of the named plaintiffs. Brueggeman testified at the sanctions hearing that although he believed that he did have sufficient information to commence the action, he would not have filed the action on that date but for the impending change in the law.

¶ 18. The complaint named the plaintiffs as representatives of a class who were injured by chemicals at JFI and alleged that JFI was negligent in a number of respects, including failure to properly design, construct, maintain and repair the JFI facility, failure to properly ventilate the facility, and failure to utilize proper equipment. The complaint also alleged that JFI violated Wis. Stat. § 101.11(2), the Safe Place Act, by failing to furnish employment that was safe for JFI's employees.

¶ 19. With respect to causation, paragraph 28 of the complaint alleged:

> On April 23, 1992, plaintiff Todd E. Jandrt was born with physical defects. On April 10, 1993, Mitchell J. Kinsley, deceased, was born with physical defects. On April 7, 1992, Tierney Liazuk was born with physical defects. Upon information and belief, said physical defects were caused in utero by the exposure of their mothers to poisonous chemicals emitted from one of the aforesaid food processing machines while they were employed at defendant Jerome Foods. . . .

¶ 20. The Previant firm subsequently made two requests for documents, the first in May and the second

on June 21, 1995. The June request asked for a broad array of documents, including those relating to any analysis by JFI of the potential health risks to employees and unborn children "as a result of exposure to chemicals," and documents relating to birth defects suffered by children of JFI employees. JFI declined to produce the documents without a confidentiality agreement. The confidentiality order was signed by the court on December 7, 1995 and the requested documents became available to the Previant firm thereafter.

¶ 21. JFI responded to the lawsuit by retaining two law firms, one as its national counsel and the other as local counsel. JFI instructed that experts be engaged to analyze the allegations of negligence and causation. JFI also retained a public relations company, an expert in environmental and infrastructure consulting, and a private investigation firm.

¶ 22. JFI served interrogatories on the Previant firm in June and again in August 1995. Among the information it sought, JFI requested every fact that supported plaintiffs' claim that exposure to "poisonous chemicals" at JFI caused the plaintiffs' birth defects. Plaintiffs responded on September 28, 1995, refusing to provide any information concerning their theory of causation, writing that JFI's inquiry into the core allegation of causation prematurely implicated expert testimony.

¶ 23. In July 1995, JFI's counsel interviewed Dr. Robert Brent, a teratology expert who opined that there was no causal nexus between any chemical at JFI and birth defects. He told JFI that no medical or scientific literature established such a connection. From July 1995, JFI believed, as Brent explained, that causation could not be proven. JFI continued, and indeed stepped up, its defense efforts following its acquisition

of this opinion. It also continued to request from the Previant firm the factual basis for the element of causation, to which the Previant firm refused to comment.

¶ 24. Aside from serving the large document request on JFI in June 1995, it appears from the record that the Previant firm made no further and independent steps to support its allegation of causation as it awaited the confidentiality order JFI requested. Once signed, JFI produced over 200,000 documents which the Previant firm inspected at JFI's facility on January 31 and February 1, 1996.

¶ 25. Following review of the documents, Brueggeman consulted with Dr. Dahir and with an in-state expert on causation. Dr. Dahir in turn consulted with an out-of-state expert. The out-of-state expert indicated that there were no studies regarding the relationship between ammonia or $CO_2$ and human birth defects and that he would be vulnerable on cross examination if he testified about causation. The in-state expert agreed that there were no scientific studies on the subject, and suggested that a better approach to causation would be to engage an epidemiologist to conduct a study to confirm what appeared to be a causal connection between JFI's environment and its employees' problem pregnancies. In securing these opinions, the Previant firm did not provide its experts with any of JFI's documents obtained through discovery; that is, none of the information obtained from JFI identifying either the types of chemicals used at JFI or the exposure level of those chemicals was provided to the experts.

¶ 26. With the expert opinions in hand, the Previant firm decided that engaging an epidemiologist to commence a study would be too expensive. On February 28, 1996, the Previant firm advised JFI's counsel

that the plaintiffs wished to voluntarily dismiss the complaint, a motion was filed and subsequently granted.

¶ 27. JFI thereafter moved for sanctions on grounds that the plaintiffs commenced and continued a frivolous action. Following a two-day hearing, the circuit court issued a memorandum decision holding that the lawsuit was filed "without a reasonable basis in fact or law," focusing particularly upon the Previant firm's failure "to complete a thorough investigation of scientific and medical experts in the field of teratology" prior to filing the complaint. The circuit court based its conclusion in large measure upon the testimony of JFI's witnesses, most particularly teratologist Dr. Brent, who testified that causation could not be proved. From his testimony the circuit court concluded that there was no scientific or medical support for the causal nexus alleged by the plaintiffs: "there was no dispute, no cause, no uncertainty." The circuit court then awarded JFI $716,081 in attorneys fees and costs.

## II

¶ 28. The Previant firm appeals the circuit court's decision that under Wis. Stat. §§ 802.05[1] and

---

[1] Wis. Stat. § 802.05 provides in relevant part:

(1)(a) Every pleading, motion or other paper of a party represented by an attorney shall contain the name. . .of the attorney. . .and shall be subscribed with the handwritten signature of at least one attorney of record in the individual's name. . . .The signature of an attorney or party constitutes a certificate that the attorney or party has read the pleading, motion or other paper; that to the best of the attorney's or party's knowledge, information and belief, formed after reasonable inquiry, the pleading, motion or other paper is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that the pleading, motion or other

814.025,[2] it commenced and continued a frivolous action. Both §§ 802.05 and 814.025 authorize a circuit court to sanction a party for commencing a frivolous action, while § 814.025 alone authorizes the imposition of sanctions upon a party maintaining a frivolous action. Where, as here, the circuit court awards sanctions for commencing a frivolous action pursuant to both §§ 802.05 and 814.025, we review the decision as one made pursuant to § 802.05. *See* Wis. Stat. § 814.025(4) ("To the extent s. 802.05 is applicable and differs from this section, s. 802.05 applies.").

paper is not used for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . .If the court determines that an attorney or party failed to read or make the determinations required under this subsection before signing any petition, motion or other paper, the court may, upon motion or upon its own initiative, impose an appropriate sanction on the person who signed the pleading, motion or other paper, or on a represented party, or on both. The sanction may include an order to pay to the other party the amount of reasonable expenses incurred by that party because of the filing of the pleading, motion or other paper, including reasonable attorney fees.

[2] Wis. Stat. § 814.025 provides in relevant part:

**Costs upon frivolous claims and counterclaims.** (1) If an action or special proceeding commenced or continued by a plaintiff or a counterclaim, defense or cross complaint commenced, used or continued by a defendant is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.

. . . .

 (3) In order to find an action. . .to be frivolous under sub. (1), the court must find one or more of the following:

. . . .

 (b) The party or the party's attorney knew, or should have known, that the action. . .was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

¶ 29. Pursuant to Wis. Stat. § 802.05, a person who signs a pleading makes three warranties:

> First, the person who signs a pleading, motion or other paper certifies that the paper was not interposed for any improper purpose. Second, the signer warrants that to his or her best 'knowledge, information and belief formed after reasonable inquiry' the paper is 'well grounded in fact.' Third, the signer also certifies that he or she has conducted a reasonable inquiry and that the paper is warranted by existing law or a good faith argument for a change in it.

*Riley v. Isaacson*, 156 Wis. 2d 249, 256, 456 N.W.2d 619 (Ct. App. 1990)(citing *Beeman v. Fiester*, 852 F.2d 206, 208–09 (7th Cir. 1988)). If the circuit court finds that any one of the three requirements set forth under the statute has been disregarded, it may impose an appropriate sanction on the person signing the pleading or on a represented party or both. Wis. Stat. § 802.05(1)(a); *but see Riley*, 156 Wis. 2d at 256 ("If any one of these three prongs has been violated, sanctions must be imposed.").

¶ 30. When made pursuant to Wis. Stat. § 802.05, our review of a circuit court's decision that an action was commenced frivolously is deferential. *Riley*, 156 Wis. 2d at 256 (citing *Mars Steel Corp. v. Continental Bank, N.A.*, 880 F.2d 928, 933 (7th Cir. 1989)). Determining what and how much prefiling investigation was done are questions of fact that will be upheld unless clearly erroneous. *Id.* "Determining how much investigation *should* have been done, however, is a matter within the trial court's discretion because the

amount of research necessary to constitute 'reasonable inquiry' may vary, depending on such things as the particular issue involved and the stakes of the case." *Id.* A circuit court's discretionary decision will be sustained if it examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982).

¶ 31. Because Wis. Stat. § 802.05 is patterned after Federal Rules of Civil Procedure 11, *Riley,* 156 Wis. 2d at 255, we may turn to federal case law interpreting Rule 11 for persuasive authority in our interpretation of the section and in the method by which it should be applied by circuit courts. *Id.* (citing *Gygi v. Guest,* 117 Wis. 2d 464, 467, 344 N.W.2d 214 (Ct. App. 1984)). Federal cases have established a number of guidelines in view of which district courts are to make their discretionary determinations of frivolousness. We believe that these guidelines serve equally well as the framework within which a circuit court should make its discretionary determination of frivolousness under § 802.05; further, in many respects, these are the same guidelines a circuit court uses in its determination of frivolousness under Wis. Stat. § 814.025.

¶ 32. First, in determining whether an action has been commenced frivolously, the circuit court is to apply an objective standard of conduct for litigants and attorneys. *See National Wrecking Co. v. International Brotherhood of Teamsters Local 731,* 990 F.2d 957, 963 (7th Cir. 1993) (in determining whether to award sanctions under Rule 11, a court "need only 'undertake an

objective inquiry into whether the party or his counsel "should have known that his position is groundless." ' " (citations omitted)); *see also Stern v. Thompson & Coates, Ltd.*, 185 Wis. 2d 220, 241, 517 N.W.2d 658 (1994) (under Wis. Stat. § 814.025, "whether the attorney knew or should have known that the position taken was frivolous [is] determined by what a *reasonable attorney* would have known or should have known under the same or similar circumstances," and is an objective standard). Section 802.05 requires that the claim be well grounded in both facts and law. Applying the objective standard when determining whether an attorney made a reasonable inquiry into the facts of a case, the circuit court should consider:

> whether the signer of the documents had sufficient time for investigation; the extent to which the attorney had to rely on his or her client for the factual foundation underlying the pleading, motion, or other paper; whether the case was accepted from another attorney; the complexity of the facts and the attorney's ability to do a sufficient pre-filing investigation; and whether discovery would have been beneficial to the development of the underlying facts.

*Brown v. Federation of State Medical Boards of U.S.*, 830 F.2d 1429, 1435 (7th Cir. 1987) (citations omitted), *abrogated on other grounds, Mars Steel Corp.*, 880 F.2d 928; *Belich v. Szymaszek*, 224 Wis. 2d 419, 430–31, 592 N.W.2d 254 (Ct. App. 1999). And in determining whether the attorney made a reasonable inquiry into the law, consideration should include

> the amount of time the attorney had to prepare the document and research the relevant law; whether the document contained a plausible view of the law;

> the complexity of the legal questions involved; and whether the document was a good faith effort to extend or modify the law.

*Brown*, 830 F.2d at 1435.

██

¶ 33. Second, the circuit court's proper analysis must be made from the perspective of the attorney and with a view of the circumstances that existed at the time counsel filed the challenged paper. *Schering Corp. v. Vitarine Pharmaceuticals, Inc.*, 889 F.2d 490, 496 (3rd Cir. 1989). "The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Advisory Committee Note*, 97 F.R.D. 198, 199 (1983). A claim is not frivolous merely because there was a failure of proof or because a claim was later shown to be incorrect. *Stern*, 185 Wis. 2d at 243 (citations omitted). Nor are sanctions appropriate merely because the allegations were disproved at some point during the course of litigation. *See Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 360 n.2 (7th Cir. 1987) (plaintiff's failure to raise a genuine issue of material fact in opposition to a motion for summary judgment was not a violation of Rule 11 where the court found that some evidence supported the plaintiff's claim).

¶ 34. With these guidelines before us, we turn to a review of the circuit court's decision. The single allegation upon which JFI has asserted that the Previant firm had no basis in fact was paragraph 28 of the complaint, the plaintiffs' allegations that their physical defects were caused in utero by the exposure of their mothers to poisonous chemicals emitted from one of a number of food processing machines used at JFI while the mothers were employed by JFI. We are therefore

directed in our review to the question of whether when the complaint was filed on May 9, 1995, the Previant firm had a sufficient basis in fact to allege that a chemical at JFI caused the plaintiffs' physical defects.

## A

¶ 35.　At the outset, we address the Previant firm's argument that it needed no evidence of causation prior to filing the action because its complaint also stated a claim for violation of the Wisconsin Safe Place Act, Wis. Stat. § 101.11. As authority, the Previant firm points to those decisions involving the safe place statute where we stated the rule of law that where a plaintiff establishes negligence in violation of the safe place statute, "the plaintiff need not prove causation, and the burden of proof is on the owner to rebut the presumption of causation." *Frederick v. Hotel Investment, Inc.*, 48 Wis. 2d 429, 434, 180 N.W.2d 562 (1970). Without deciding whether the presumption applies to the safe place violation asserted here, we conclude that it is a presumption not applicable to the claim of common law negligence.

¶ 36.　Plaintiffs alleged two claims each against JFI, one common law negligence, the other a violation of the safe place statute. Without regard to the adequacy of the allegation of a violation of the safe place statute, each element of the plaintiffs' common law negligence claims needed to be well-grounded in fact, for the inclusion of one sufficient and adequately investigated claim does not permit counsel to file unsubstantiated claims as riders. *See Frantz v. U.S. Powerlifting Federation*, 836 F.2d 1063, 1067 (7th Cir. 1987). "Each claim takes up the time of the legal system and the opposing side. . . .Rule 11 applies to all statements in papers it covers. Each claim must have

sufficient support; each must be investigated and researched before filing." *Id.* (citations omitted). "[T]he prevailing notion is the sensible one that time needlessly forced to be spent on the elimination of frivolous claims or in dispelling frivolous arguments should be compensable even though other claims or arguments have been reasonably advanced." *Les Mutuelles du Mans Vie v. Life Assur. Co.*, 128 F.R.D. 233, 237 n.6 (N.D.Ill 1989). The significant amount of time and money JFI spent on researching and investigating causation as alleged in the complaint is a good case in point, and we conclude that the element of causation within the plaintiffs' common law negligence claims required factual support.

## B

¶ 37. The Previant firm contends that independent of its claim under the safe place statute, on May 9, 1995, when the plaintiffs' action was filed, it possessed the following facts which, together, satisfied the requirement that the allegation of causation was well grounded in fact:

(1) Between April 1992 and April 1993, three women employed by JFI gave birth to children with birth defects

(2) A total of approximately twelve to fifteen women employed at JFI had reported problem pregnancies

(3) The plaintiffs' mothers reported excessive amounts of ammonia and $CO_2$ in the work environment at JFI

(4) The plaintiffs' mothers believed that their exposure to chemicals while at JFI caused the birth defects of their children

(5) Literature indicated that birth defects could be caused by chemicals in the environment

(6) An analysis by a Previant associate, using a process of elimination, ruled out other known causes of the spina bifida suffered by two of the plaintiffs

(7) One plaintiffs' mother's doctor told the mother that chemicals at JFI could have caused her child's spina bifida

(8) A non-expert physician, Dr. Dahir, advised that the plaintiffs needed discovery concerning the specific chemicals in the environment at JFI as well as the levels of exposure to the chemicals before they could secure an expert opinion on causation

(9) Information suggested that JFI management may have been covering up the relationship between chemicals and birth defects by disciplining a supervisor who told one mother to seek legal counsel

¶ 38. The circuit court's decision that the action was commenced frivolously was based on its findings that the element of causation was not well-grounded by these facts and that the Previant firm should have made a more thorough investigation of the causal nexus prior to filing. We review the circuit court's findings regarding the investigation the Previant firm should have made for an erroneous exercise of discretion. *Riley*, 156 Wis. 2d at 256.

¶ 39. The circuit court made numerous findings regarding the Previant firm's unreasonable inquiry that reflect upon the facts the Previant firm knew. For ease of analysis, we combine these findings into two groups. First, the circuit court found that the Previant firm should not have relied on Sherman's investigation

nor on any of the mothers' statements for the factual basis of causation; second, and central to its decision that the action was commenced frivolously, the Previant firm should have consulted with an expert on causation prior to filing. We address these findings in turn.

¶ 40. Attorneys do not have an unfettered right to rely on either the investigation of a referring attorney or on client statements for the factual basis of a claim. While there is authority in support of the Previant firm's argument that an attorney receiving a case from another attorney is entitled to place some reliance upon the other attorney's investigation, *see Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 446 (5th Cir. 1992), this rule is not without limitation. An attorney may not so rely when to do so would be unreasonable:

> In relying on another lawyer, however, counsel must 'acquire[ ] knowledge of facts sufficient to enable him to certify that the paper is well-grounded in fact.' Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 187 (1985). An attorney who signs the pleading cannot simply delegate to forwarding co-counsel his duty of reasonable inquiry. *Id.*

*Unioil, Inc. v. E.F. Hutton & Co., Inc.*, 809 F.2d 548, 558 (9th Cir. 1986). The circuit court found that the information that Sherman possessed and passed on to Brueggeman was "skeletal," a finding that we do not believe is clearly erroneous. The facts uncovered by Sherman would have been insufficient to establish the causal nexus had Sherman filed this action. These same facts could not become sufficient by virtue of their transfer to the Previant firm.

¶ 41. It is also true, as the Previant firm contends, that an attorney may rely upon his or her client for the factual basis of a claim when the client's statements are objectively reasonable. *See Miller v. Bittner*, 985 F.2d 935, 939 (8th Cir. 1993). However, as is true of reliance on information provided by a referring attorney, reliance on a client is not without limitation. In deciding whether he or she may rely solely on a client for the facts that are at the foundation of a claim, "the attorney should determine if the client's knowledge is direct or hearsay and check closely the plausibility of the client's account—particularly if the information is secondhand." *Harris v. Marsh*, 679 F.Supp. 1204, 1386 (E.D.N.C. 1987)(citing *Nassau-Suffolk Ice Cream v. Integrated Resources*, 114 F.R.D. 684, 689 (S.D.N.Y. 1987)). When an attorney must rely on his client, as Previant here stated that it needed to, the attorney should question his client closely and not accept the client's version on faith alone. *Id.* (citing *Nassau-Suffolk Ice Cream*; *Fleming Sales Co. v. Bailey*, 611 F.Supp. 507, 519 (N.D. Ill. 1985)).

¶ 42. The statement offered by Liazuk that her daughter's neurosurgeon told her that "chemicals that you worked around and with could have caused the spina bifida" was relied upon, in part, as evidence that ammonia caused Liazuk's spina bifida, and the birth defects of the other two plaintiffs. While Liazuk's statement may have been objectively reasonable, the circuit court found that Previant should have contacted the neurologist prior to filing to determine whether he in fact did opine as to the causation of this plaintiff's birth defect and whether the doctor was qualified to so opine.

¶ 43. The circuit court did not erroneously exercise its discretion in making this finding. The authority that an attorney may rely on a client for information

rests in notes to Rule 11 which instruct that whether an attorney's inquiry is reasonable may depend upon "whether he had to rely on a client for information as to the facts underlying the pleading. . . ." *Advisory Committee Note*, 97 F.R.D. at 199. The fact at issue here was whether ammonia or $CO_2$ could cause the plaintiffs' birth defects. The Previant firm did not need to rely upon Liazuk for the physician's statement as a basis for causation. Unlike the situations in which a client's statement could not be verified without discovery, Liazuk's could have been. The Previant firm could have contacted Dr. Harris to determine whether he did have an opinion as to causation and it chose not to, citing strategic reasons for not doing so. The circuit court believed that this was an unreasonable action, and its finding is not clearly erroneous given the Previant firm's lack of any other evidence of causation. As the circuit court noted, it was even less reasonable for the Previant firm to extrapolate from this one statement that the birth defects of the other plaintiffs were likewise caused by ammonia. The circuit court's decision with respect to these findings must be upheld.

### The Need for Expert Opinion

¶ 44. The circuit court also believed that the Previant firm's failure to complete a thorough investigation of scientific and medical experts in the field of teratology was unreasonable. The Previant firm argues that by so finding, the circuit court erred as a matter of law because there is no *per se* requirement that an expert be retained prior to filing. We agree that an expert need not be retained prior to filing an action as a matter of law. However, we disagree that the circuit court's finding should be read so broadly.

¶ 45. We have discovered no federal or state decision which directly addresses whether as a matter of law, Rule 11 or a comparable state rule governing frivolous actions requires a party to have in place an expert opinion prior to commencing an action. In those few cases in which the question has been addressed even tangentially, the answers vary. For instance, in *Simpson v. Chesapeake & Potomac Telephone Company, Inc.*, 522 A.2d 880, 884–85 (D.C. 1987), the court found that under circumstances in which the plaintiff had almost three years from the time of an alleged incident to the time she filed suit in which to investigate the causes of an alleged accident, her failure to identify an expert who would testify on her behalf regarding the defendants' duty of care in interrogatories suggested that she had failed to ascertain a basis for her claim prior to filing. *Id.* at 884–85. The court believed that the plaintiff could not have reasonably believed that the defendants had breached an applicable standard of care without expert advice to that effect prior to filing. *Id.* at 885.

¶ 46. In *Meyer v. Mulligan*, 889 P.2d 509 (Wyoming 1995), the Wyoming court explained that an expert would not be needed prior to filing an action alleging legal malpractice where the attorney who files is himself an "expert" in the legal area. *Id.* at 518. However, it believed that before "an attorney files a legal malpractice action where the underlying case of alleged malpractice involves a complex or specialized area of the law, with which [an attorney is] unfamiliar, that attorney should first consult with an expert in the complex or specialized legal arena about the standard of care." *Id.* The court did not discuss, however, whether the failure to contact an expert witness prior to filing would be a violation of its frivolous lawsuit

statute, modeled after Rule 11, as a matter of law and without regard to the additional circumstances facing the attorney prior to filing.

¶ 47. Federal decisions further suggest that expert witnesses are not required prior to commencing an action. For instance, in *Teck General Partnership v. Crown Central Petroleum Corp.*, 28 F.Supp.2d 989, 992 n.9 (E.D. Va. 1998), the court wrote that "[i]t is arguable whether, in some instances, Rule 11, Fed.R.Civ.P., may require retention or consultation with an expert before certain allegations may be included in a complaint." And in *RTC Mortgage Trust v. Fidelity National Title Insurance Co.*, 981 F.Supp. 334, 345 (D.N.J. 1997), the court explained that "Rule 11 neither demands nor regulates consultation with an expert . . . ."

¶ 48. As a body, these cases are inconclusive. While good practice may dictate that an expert be consulted prior to filing a claim upon which expert testimony will necessarily be required at trial, a *per se* rule that an expert opinion is always required cannot be squared with the objective standard by which an attorney's investigation is to be judged. The test for frivolousness should take into consideration all of the circumstances facing the party commencing an action at the time the party files, and at times those circumstances may be such that an expert witness is not needed prior to filing.

¶ 49. Here, though, the circuit court did not rule that the Previant firm needed an expert witness as a matter of law and without regard to the circumstances it faced. Instead, the circuit court quite thoroughly explained its decision as one requiring expert opinion precisely because in its view the Previant firm had no other objective evidence of causation. As the claim had

no basis in fact, the court believed that the firm should have consulted an expert to establish that basis.

¶ 50. While it did give some consideration to the circumstances, we nonetheless conclude that the circuit court drew its conclusion that an expert needed to be contacted prior to filing by improperly relying upon hindsight and for failing to give appropriate consideration to the amount of time within which the Previant firm had to conduct an investigation prior to a substantial change in the law.

¶ 51. As we explained, the amount of time an attorney has to investigate a claim is one consideration that shapes the objective standard for determining whether an attorney's inquiry was reasonable. The amount of time reasonably necessary to investigate a claim is itself variable, dependent upon the complexity of the claim. Here, the attorneys could not be expected to have conducted as thorough an investigation as they would have had they had longer than six weeks in which to file prior to the change in the law of joint and several liability. *See Smith,* 960 F.2d at 447 (because the lawyers had only two months in which to investigate a civil Racketeer Influenced & Corrupt Organizations Act (RICO) suit prior to the running of the statute of limitation, they "could not be expected to conduct as complete an inquiry as they could have had [the plaintiff] consulted them earlier"). "[A]s the Supreme Court noted [in *Cooter & Gell*], if a lawyer discovers that his client has a potential cause of action only a short time before the statute of limitations will expire, a more cursory inquiry will be tolerated than when he has ample time to investigate." *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1364 (9th Cir. 1990)(citing *Cooter & Gell v. Hartmarx Corp.,* 110 S.Ct. 2447, 2459 (1990)).

¶ 52. While the plaintiffs' claims were not jeopardized by an impending statute of limitations, the change in the law of joint and several liability was a real concern for the Previant firm and one which reasonably contributed to its decision to file earlier than it would have otherwise done. The circuit court summarily and in error rejected the firm's concern and found that the change in the law of liability did not excuse the firm's failure to make an appropriate investigation.

¶ 53. The circuit court noted that from the time the Previant firm admitted it knew that the law was going to change to the time it took effect, it had more than six weeks to make a meaningful investigation. The court then concluded that six weeks was plenty of time to investigate because, relying upon the testimony of JFI's expert Dr. Brent, "a consultation with a qualified teratologist lasting more than four or five hours would have revealed that the causation theory was meritless."

¶ 54. The court erroneously exercised its discretion in reaching this conclusion. First, the Previant firm did not fail to make any investigation into causation. It did conduct a literature search and one of its associates engaged in an elimination theory of causation which included interviews with the plaintiffs' mothers and two fathers. While the court found this investigation to be inadequate as support for causation, the investigation itself was not found to be an unreasonable attempt to establish causation. Certainly, as the Previant firm considered the time within which it had to file prior to the change in the law, it could not know that its investigation would be as fruitless as it turned out to be. Further, the circuit court's finding that had the Previant firm contacted a teratologist, a five-hour conversation would have established

that causation could not be proven is a conclusion made manifestly with the benefit of hindsight. It presumes that causation is impossible to prove (a decision which appears to be made on the merits of the action even though made through Dr. Brent's testimony at the sanctions hearing), that a reasonable attorney would know that under the circumstances then facing it that a teratologist needed to be contacted, and it ignores the evidence offered by the Previant firm at the sanctions hearing that an epidemiological study could possibly establish causation.

■

¶ 55. Although a close case, upon considering the facts and circumstances facing the Previant firm when it commenced the action, and resolving all doubts about frivolousness in favor of the Previant firm, *see Juneau County v. Courthouse Employees*, 221 Wis. 2d 630, 640, 585 N.W.2d 587 (1998), we conclude that the Previant firm did not frivolously file this lawsuit. Given the information that it knew, coupled with the short amount of time in which it reasonably believed it needed to file the lawsuit, the Previant firm did not commence this action frivolously.

### III

¶ 56. We must next consider whether the Previant firm's continuation of the action was frivolous under Wis. Stat. § 814.025(3)(b), as found by the circuit court. We recently explained the standard we use in reviewing a circuit court's finding under § 814.025 that an action is frivolously continued:

> Inquiries about frivolousness involve a mixed question of law and fact. *Stern*, 185 Wis. 2d at 241 (citing *State v. State Farm Fire & Cas. Co.*, 100 Wis. 2d

582, 601–02, 302 N.W.2d 827 (1981)). The determination of what a party·or attorney "knew or should have been known" [under Wis. Stat. § 814.025] is a factual question, and the circuit court's findings of fact will not be reversed by an appellate court unless the findings of fact are clearly erroneous. *See* Wis. Stat. § 805.17(2).

The ultimate conclusion of whether the circuit court's factual determinations support the legal determination of frivolousness is, however, a question of law, which this court determines independent of the circuit court or court of appeals, benefiting from the analysis of both courts. *Id.* (citing *State Farm,* 100 Wis. 2d at 602).

*Juneau County,* 221 Wis. 2d at 638–39.

¶ 57. Costs and reasonable attorney fees must be awarded to JFI if the court is satisfied that the Previant firm knew or should have known that its allegation of causation was "without any reasonable basis in law or equity." Wis. Stat. § 814.025(1) and (3)(b). We explained in Part II of this opinion that although the case was close, under the circumstances the Previant firm faced when it commenced the action, it made a reasonable inquiry into the underlying facts of causation prior to filing. We reached this conclusion based with a view to the relatively short time period between the Previant firm's retention and the change in the law of joint and several liability. However, under § 814.025, a party is not relieved of its responsibility to ensure that an action is well-grounded in fact and law once an action is commenced. A party's responsibility for the factual basis of a claim is on-going. Once a party knows or should have known that a claim is not supported by fact or law, it must dismiss or risk sanctions.

¶ 58. The circuit court found that the Previant firm did not meet it responsibility under Wis. Stat. § 814.025. The circuit court made numerous findings which together demonstrate, as the circuit court ultimately concluded, that the Previant firm never had a reasonable basis in fact supporting the element of causation during the entire nine months it continued the action against JFI.

¶ 59. We have no doubt that, as the circuit court found, the Previant firm "recognized that the causal component of the claim—that is, that *in utero* exposure to carbon dioxide, ammonia, and/or other chemicals used at JFI caused the specific birth defects suffered by plaintiffs—was an essential element of the contemplated allegations." This finding is well supported by the record and is not disputed by the parties. However, it is the facts the Previant firm knew and what it should have done in light of its recognition that the causal element was essential to its claim that lies at the heart of this appeal.

¶ 60. The circuit court's findings on this question are quite detailed. First, the circuit court found that at no time prior to the dismissal of the complaint did the Previant firm:

 a. Obtain an expert witness who supported the causation theory upon which the claims in the complaint rested.

 b. Consult with an identified scientific or medical professional with expertise in the areas of teratology, toxicology, epidemiology, genetics, pediatrics or the causes of birth defects.

 c. Interview any treating physician of any of the mothers or the children in question.

d. Pursue the purported "cover up" identified as one of the bases for the filing of the complaint.

Each of these facts is well-supported by the record: Brueggeman testified during the sanctions hearing that the Previant firm made none of these inquiries. These circuit court findings are not clearly erroneous and this court must accept each as true.

¶ 61. The circuit court also found that the Previant firm never engaged in any of the following activities:

a. A comprehensive review of the medical records of the mothers and children in question.

b. An identification of the risk factors present in the mothers of the three plaintiffs indicative of causation of the birth defects in question.

c. An evaluation, through consultation with appropriate medical and scientific authorities, of the scientific invalidity of Attorney Bangert's "elimination analysis," as well as the irrelevance of the presence of multiple "pregnancy problems" among female employees of JFI.

None of these facts are clearly erroneous and we must accept each as true.

¶ 62. Further, the circuit court found that:

The Previant Firm unreasonably followed Dr. Dahir's suggestion to commence a lawsuit in order to "take discovery" regarding the nature and extent of plaintiffs' mothers exposure. First, as Mr. Gleichert testified, the Previant Firm was entitled as a matter of law to obtain from JFI the names of all chemicals used at JFI, as well as the results of all tests measuring the amount of chemicals in the workplace atmosphere. It was unnecessary, and

therefore unjustified, for the Previant Firm to sue JFI to obtain this information. Second, the "discovery" sought by the Previant Firm could not correct the absence of any scientific support for the underlying theory of causation. Even if plaintiffs' counsel would have unearthed documents at JFI indicating that the mothers were exposed to unacceptable levels of chemicals (and there was no such evidence), that information would not have provided the fundamental and necessary causal link to the birth defects. Only an expert could have provided the critical link. Rather, any such documents merely would have corroborated statements by the mothers about alleged exposure to chemicals.

It was unreasonable for the Previant Firm to rely on the "elimination analysis" performed by Attorney Bangert. Not only did Attorney Bangert have no qualifications to perform such an analysis, her conclusions were entirely unfounded. As Dr. Brent testified, Attorney Bangert failed to consider risk factors, as such were contained in the mothers' medical records, for the specific birth defects in question; moreover, her conclusion that "eliminating" certain potential causes "left" exposure to carbon dioxide and ammonia as the actual cause of the birth defects in question is simply wrong as a matter of science and logic.

It was unreasonable for the Previant Firm to rely on the purported existence of multiple "pregnancy problems" among female employees of JFI. As Dr. Brent indicated, the presumed instances of miscarriages, premature births, still births, low birth weights, and other complications counsels *against* the presence of a single teratogenic agent and provides no support for plaintiffs' claims.

At no time prior to its review of the documents [inspected on January 31 and February 1, 1997] did

the Previant Firm make any effort to obtain a quali-
fied expert to support the causation theory
advanced in the complaint, nor did it obtain any
other scientific support for the proposition that
exposure to carbon dioxide, ammonia or any other
chemical used at JFI causes birth defects.

The Previant Firm failed to offer any testimony
indicating that either the "in state" or "out of state"
consultant was ever shown any of the documents
produced by JFI.

Together, these are the essential findings of fact upon
which the circuit court drew the conclusion that the
Previant firm frivolously continued this action. Each of
these findings is supported by the record, and we must
accept each as true.

■

¶ 63. Despite these findings, the Previant firm
defends its continuation of this action, arguing that it
is entitled to "safe harbor" to investigate the facts
underlying causation and that it satisfied its obligation
to do so with its June 21, 1995 request for documents.
This argument finds its genesis in *Stern*, 185 Wis. 2d at
235, where we explained that because an attorney has
an obligation to zealously represent his or her client's
interests, he or she may in the appropriate circum-
stance make "some claims which are not entirely clear
in the law or on the facts, at least when commenced."
This statement has since been interpreted as providing
"parties and attorneys a 'safe harbor' in that they may
file a pleading without fear of sanctions as long as they
make a reasonable inquiry as to uncertain or unclear
facts within a reasonable time after the pleading is
filed." *Kelly v. Clark*, 192 Wis. 2d 633, 651, 531 N.W.2d
455 (Ct. App. 1995).

¶ 64. However, just as an attorney's right to rely on a referring attorney or on the statements of clients is not without limitation, use of "safe harbor" is not unfettered. The "safe harbor" identified in *Kelly* is a result of the adoption of our rules of civil procedure in 1976 which brought to an end a party's ability to conduct discovery for the purposes of pleading. *See id.* at 650. "Now, a party and his or her attorney must commence an action before conducting discovery." *Id.* "Safe harbor" is responsive to the problem created by the rule change and allows attorneys to bring an action even though some facts are uncertain or unclear. Thereafter, discovery may be made to bring certainty and clarity to the facts. However, "safe harbor" does not relieve an attorney from establishing a factual basis for a claim when that basis could be established by means other than discovery. That is, "safe harbor" is not a loophole through which attorneys may escape the requirement of Wis. Stat. § 814.025 that an action have a reasonable basis in law or equity.

¶ 65. Yet such a loophole is precisely what the Previant firm's argument would create, and is a position with which the dissent agrees. We do not hold, as is stated by the dissent, that as a matter of course a plaintiff must exhaust outside sources of information before embarking on formal discovery. *See* dissenting op. at 585–86. However, we do believe that a plaintiff may not rely on formal discovery to establish the factual basis of its cause of action, thereby escaping the mandates of both Wis. Stat. §§ 802.05 and 814.025, when the required factual basis could be established without discovery. The dissent ignores the requirement of these two statutes that a party must have a

reasonable basis in fact for each claim and that when, and *only* when, that factual basis cannot be established but for discovery, "safe harbor" may be provided to help the party establish the factual basis. *See, e.g., Kelly,* 192 Wis. 2d at 651 (attorney was permitted to rely on a client's statements because he had no way to verify the facts related without discovery). "Safe harbor" simply cannot be a mechanism by which a party is permitted to file and continue an action to conduct discovery for information which is available short of discovery. If the law were otherwise, §§ 802.05 and 814.025 would be of little worth and no factual basis for a claim would ever need be required. Under the dissent's view, a "file first and ask questions later" approach to litigation would carry the day.

¶ 66. Nonetheless, the Previant firm contends that its June 1995 discovery request was intended to uncover documents which would help it establish causation. The Previant firm explains that under *Stern* and *Kelly,* it had a right to file the action and "a duty thereafter to make a reasonable inquiry as to the unclear facts surrounding the issue of causation (e.g., the chemicals used at JFI and the exposures to which the mothers were subjected)." On the record before us, the Previant firm apparently believes that its duty to make a "reasonable inquiry" required no activity beside its request for documents.

¶ 67. The circuit court rejected the Previant firm's view of its right to "safe harbor" for two reasons. First, it found that the Previant firm should not have relied upon the two-minute conversation with Dr. Dahir in which he advised that an expert in causation could not be contacted until the Previant firm had discovered the exposure levels of chemicals at JFI. The court found that Dahir had no experience in teratology,

epidemiology, or the causes of spina bifida, heart malformation or any other birth defects, was not board certified in any specialty, did not have training that would qualify him to render a competent opinion regarding relationships between specific chemical exposures and specific birth defects, and that he had never read any of the medical records of the plaintiffs or their mothers. In essence, the circuit court found that Dahir did not have sufficient expertise to opine on whether discovery needed to be made prior to contacting an expert witness on causation. The Previant firm did not offer any evidence that Dahir was qualified to make such a recommendation, and the circuit court's finding that Dahir should not have been relied upon is not clearly erroneous.

¶ 68. Second, and more importantly, the circuit court found, as we have quoted above, that the information the Previant firm claims it needed prior to acquiring an expert opinion (i.e., the chemicals used at JFI and the exposures to which the mothers were subjected) could have been acquired without discovery. The circuit court based its finding on the testimony of Gregg Gleichert, JFI executive vice-president, who explained at the sanctions hearing that under the Occupational Safety and Health Act (OSHA), JFI is required to maintain records of all chemicals used in the workplace as well as the results of tests monitoring the chemical exposure. Under OSHA, this information is available to employees, former employees and their representatives by simply asking for that information. The Previant firm does not dispute this finding; it is a finding supported by the record and is not clearly erroneous.

¶ 69. The Previant firm may have believed that JFI had more detailed information on the levels of

exposure than that which is required by OSHA. However, that belief does not excuse the Previant firm for failing to avail itself of information that was available without discovery. While discovery may frequently provide the details essential to proving a claim, as we have noted, for the purposes of Wis. Stat. § 814.025, an attorney may not ignore information that is available that would help to establish the claim's factual basis. The Previant firm has made quite clear that the reason it had to engage in discovery was its need to know the types of chemicals used at JFI and employees' level of exposure to those chemicals. It is undisputed that this information was available to the Previant firm short of discovery. The circuit court drew the further inference that discovery was not really necessary to obtain the expert opinions since the Previant firm did not provide the experts with any information it obtained from JFI in securing their opinions.[3]

---

[3] The dissent states that the Previant firm was merely engaging in "cautious lawyering" by choosing not to show any document it acquired from JFI to its experts. Dissenting op. at 587–88. However, in noting the Previant firm's strategy, the dissent loses sight of the reason the firm stated that it needed to file and then maintain this action without any factual basis for causation: namely, it believed that it could *only* establish causation by conducting discovery to identify the types of chemicals used at JFI and the levels to which employees were exposed to those chemicals. That information, it has explained, had to be discovered *before* an expert would opine on causation. Aside from the fact that the circuit court found that this information was available short of discovery, there is some inconsistency in needing to engage in discovery for information that will be shown to an expert, and then receiving an opinion from an expert without providing the expert with any of discovered information.

¶ 70. It matters little that the Previant firm describes its discovery as one which uncovered "remarkably fruitful" evidence supporting its allegations of negligence. While this may indeed be true, causation is the element for which the Previant firm needed evidence, and those documents which helped to support the element of negligence is irrelevant to that information which it repeatedly states it needed to acquire before it could contact an expert witness.

¶ 71. We turn now to consider the circuit court's determination that this claim was frivolously continued. None of the circuit court's findings of fact pertaining to the Previant firm's continuation of this claim is clearly erroneous. Each has ample support in the record, and we must accept each as true. However, whether these factual determinations support a finding of frivolousness is a matter of law which we review independent of the circuit court, benefiting from its analysis. *Juneau County*, 221 Wis. 2d at 638–39.

¶ 72. We are mindful of the delicate balance involved in the application of Wis. Stat. § 814.025. A significant purpose of the statute is to help maintain the integrity of the judicial system and the legal profession. *Juneau County*, 221 Wis. 2d at 639 (citing *Sommer v. Carr*, 99 Wis. 2d 789, 799, 299 N.W.2d 856 (1981)). As we have explained, courts and litigants should not be subjected to actions without substance. *Id.* At the same time, we must also recognize that courts must be cautious in declaring an action frivolous, for to do so may stifle "the ingenuity, foresightedness and competency of the bar." *Id.* (citing *Radlein v. Industrial Fire & Cas. Ins. Co.*, 117 Wis. 2d 605, 613, 345 N.W.2d 874 (1984)). In making the appro-

priate balance between these competing interests, we will declare the continuation of an action frivolous only when there is no reasonable basis for a claim. *Id.* Any doubts about the reasonableness of claim will be resolved in favor of the litigant or attorney subject to the sanctions motion. *Id.*

¶ 73. Here, with a view to the findings made by the circuit court, we have no doubts that the Previant firm frivolously continued this action. The essential element of the plaintiffs' allegation requiring a factual basis was causation. The circuit court found that discovery was not required to obtain the information the Previant firm would rely upon in securing an expert opinion, that the Previant firm made no efforts aside from the discovery request to establish the necessary causal nexus, and that once it did contact experts, it did not provide those experts any of the information it obtained as a result of discovery. The circuit court also found that what information that the Previant firm did have from its clients and the referring attorney should not have been relied upon. Although we do not come to this decision lightly, we conclude that these facts as found by the circuit court do support a finding that the action was continued frivolously as a matter of law.[4]

---

[4] In contrast, the dissent summarily asserts that "an independent review of [the] facts demonstrates that the suit was not frivolous." Dissenting op. at 582. In so concluding, the dissent lists six "facts" that the Previant firm knew prior to filing this action and four documents that the Previant firm uncovered during discovery as evidence that the action was not continued frivolously. The dissent's error in relying on these pieces of information is two-fold. First, the circuit court found that none of the six facts could be relied upon and that the Previant firm should have made additional inquiries. As we have discussed, these findings are not clearly erroneous. Further, the dissent's

¶ 74. The Previant firm remains firm in its belief that causation could still be established through an epidemiological study, and that the most that one might surmise from its investigation into causation is that "to date there is no scientific literature conclusively demonstrating a causal link between these chemicals and birth defects." We believe that these statements underscore the dearth of evidence supporting causation, in view of which it was unreasonable to continue this action.

¶ 75. In sum, the cornerstone of this conclusion rests in this: 1) causation—the causal connection between any amount of a chemical used at JFI and the plaintiffs' birth defects—was the critical element of the plaintiffs' claims; 2) following the filing of the complaint, for nine months the Previant firm did nothing to try to establish this causation. Certainly the Previant firm sought discovery, but this discovery did not go to establishing the basic nexus between chemicals and the birth defects. This is what the circuit court found, and there is ample evidence in the record to support the finding. The law gives a lawyer great power in starting a lawsuit. The filing of a complaint can set in gear, as it did here, a great deal of activity—costly activity—with respect to the defendant. With the power to institute a lawsuit must come responsibility. With the problems

analysis is notable for its failure to address the circuit court's findings of fact—findings which unless clearly erroneous must serve as the basis for its review of whether the action was frivolously continued. Second, the determination of what an attorney knew or should have known is the question to consider in evaluating whether an action was frivolously continued. The dissent inappropriately looks to documents discovered nine months after the action was filed.

this case presented to the plaintiffs, the plaintiffs had a responsibility to do more than sit and wait.

¶ 76. Finally, the amount of attorney fees and costs to be awarded will depend upon the time at which this court determines that the action was continued frivolously. We deem it appropriate to award fees and costs beginning on June 21, 1995. It was upon that date that the Previant firm served on JFI its second request for documents, following which it made no further investigation into causation, and in response to which JFI began to accumulate substantial fees and costs defending itself against the action.

IV

¶ 77. The Previant firm also appeals the amount awarded JFI in reasonable attorney fees and costs. We will sustain a circuit court's award of attorney fees unless its determination is clearly erroneous. *See Standard Theatres v. Transportation Dept.*, 118 Wis. 2d 730, 747, 349 N.W.2d 661 (1984). This deference is extended to the circuit court on both the prevailing rate as well as the facts concerning the magnitude of the effort required to meet the challenges of litigation. *See id.* at 747–52 (while we explicitly stated that we review the value of fees for an erroneous exercise of discretion, we in practice also reviewed the reasonableness of the preparations an attorney made under this deferential standard). This deferential standard of review acknowledges the circuit court's advantageous position in determining the reasonableness of a firm's rate and preparations. *See id.* at 747.

'[The trial judge] has observed the quality of the services rendered and has access to the file in the

case to see all of the work which has gone into the action from its inception. He has the expertise to evaluate the reasonableness of the fees with regard to the services rendered.'

*Id.* (citing *Tesch v. Tesch*, 63 Wis. 2d 320, 335, 217 N.W.2d 647 (1974). In reviewing an award of attorney fees, we recognize that although reasonableness is a question of law, due to the circuit court's superior position, we give weight to the circuit court's determination. *Nelson v. Machut*, 138 Wis. 2d 301, 305, 405 N.W.2d 776 (Ct. App. 1987).

¶ 78. Because the circuit court properly found that the Previant firm frivolously continued the underlying action, and we affirm, sanctions in this case are mandatory. *See* Wis. Stat. § 814.025(1) (if an action continued by a plaintiff is found frivolous, the "court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees."). The Previant firm argues that while the sanction is mandatory, the amount awarded is not reasonable and is contrary to the purpose of Wis. Stat. § 814.025 which it believes is to deter litigants and attorneys from commencing or continuing frivolous actions and to punish those who do so.

¶ 79. While we agree with the Previant firm that deterrence and punishment are the underlying purposes of § 814.025, *see Stoll v. Adriansen*, 122 Wis. 2d 503, 511, 362 N.W.2d 182 (Ct. App. 1984), we are less convinced that compensation is not an appropriate consideration. Certainly, deterrence and punishment of an attorney or party who maintains a frivolous action is not inconsistent with fully compensating an opposing party for the costs and attorneys fees required to defend a frivolous action. In *Johnson v. Calado*, 159

576

Wis. 2d 446, 464 N.W.2d 647 (1991), in what is admittedly dicta, we wrote that Wis. Stat. § 814.025 may "in a proper case, provide full compensation for reasonable attorney fees necessary to defend against a frivolous claim." *Id.* at 462. We embrace this view today.

¶ 80. While not the primary purpose of rules governing frivolous claims, compensating those forced to defend frivolous litigation may be appropriate. *See Retired Chicago Police Ass'n v. Firemen's Annuity*, 145 F.3d 929, 933 (7th Cir. 1998)(citing *Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 645–46 (7th Cir. 1992).[5] Logic dictates that "reasonable" sanctions would make a party whole by including in sanctions all the costs and fees associated with defending against a frivolous action. While a court may not be obligated to do so, use of a "but-for" standard for sanctions may be sensible. Such a standard shifts to the violator the economic burden of all fees and expenses reasonably generated in response to the frivolous argument or pleading. *See Les Mutuelles du Mans Vie*, 128 F.R.D. at 237. Under such a "but-for" approach, the circuit court should make findings as to what fees and expenses were reasonably generated.

¶ 81. Further, in determining the appropriate amount of fees and expenses, a court should "reflect upon equitable considerations in determining the amount of the sanction." *Brown v. Federation of State Medical Boards of U.S.*, 830 F.2d 1429, 1438–39 (7th Cir. 1987).

---

[5] While Wis. Stat. § 814.025 does not mirror Rule 11 as does Wis. Stat. § 802.05, both statutes provide for reasonable attorney fees and costs upon a finding that an action is frivolous, and case law interpreting the federal rule may be persuasive authority on the question of reasonable attorney fees and costs under § 814.025.

> Although equitable considerations are not relevant to the initial decision to impose sanctions [ ], once a court determines that sanctions are appropriate, equitable factors may be an ingredient in. . .fashioning an award.

*Id.* at 1439. Relevant considerations may include the sanctioned attorney's assets or whether the party seeking fees caused the litigation to be longer than necessary. *Id.* (citations omitted). In some circumstances, "[a] duty of mitigation exists, and a district court should ensure that the party requesting fees has not needlessly protracted the litigation." *Id.* (citing *Schwarzer*, 104 F.R.D. at 203 ("A party having vigorously resisted a baseless claim may therefore find that the court, in making an award, will consider its expenditures to have been excessive." (footnote omitted))).

¶ 82. Turning to the award made by the circuit court, we observe that it made very thorough findings of fact and conclusions of law with respect to the reasonableness of JFI's response to the claim. It viewed the claim as one which would be devastating to JFI, and expressed the view that

> [JFI] would have to be comatose not to see [the claim] as a significant threat to the corporation. It was reasonable for a national corporation such as Jeromes. . .to seek the best legal resources they felt were available to them and to prepare for and to fully defend the suit to protect their corporate assets.

The record amply supports the court's findings in most respects.

¶ 83. However, the circuit court's conclusion that the fees were reasonable was based upon its view that JFI, facing the complaint, would reasonably have undertaken all the costs of the defense that it did here. However, the circuit court did not explicitly consider whether JFI's defense remained reasonable upon receiving Dr. Brent's opinion in July of 1995. It is difficult to square JFI's varying views that causation was impossible to prove as a matter of law and the need to expend the hundreds of thousands of dollars that JFI expended in defending this suit. *See Kirk Capitol Corp. v. Bailey*, 16 F.3d 1485, 1491 (8th Cir. 1994)("[T]here is something very inconsistent with the assertion that the plaintiffs filed a patently frivolous complaint meriting sanctions under rule 11 and contending that it took 279.10 or even 179.10 hours of legal work to reveal what the defendants contend is obvious.").

¶ 84. Because the award of attorneys fees and costs was based on both the commencement and continuation of a frivolous complaint, we remand to the circuit court for a determination of the appropriate costs and attorneys' fees due only to the plaintiffs' maintenance of a frivolous claim under Wis. Stat. § 814.025. Although the record contains a fairly detailed description of JFI's costs and attorneys fees, this court cannot determine precisely those costs and fees to be attributed to JFI's defense as part of the continuation of the action. Further, the circuit court adopted the recommendations that a certain amount of the attorneys fees should be excluded based on duplication of effort and imperfect efficiencies. The record does not disclose the manner in which this discount was applied by the circuit court and therefore we do not

have the necessary information with which to make this calculation here.

¶ 85. In making its determination, we direct the circuit court to compute the costs and attorneys fees from June 21, 1995, and in doing so take into its consideration the equitable factors we have identified above. In particular, the circuit court should give whatever weight it believes appropriate as a mitigating factor the opinion JFI obtained from Dr. Brent in July 1995 that the Previant firm could not establish causation.

*By the Court.*—The judgment of the circuit court is affirmed in part and reversed in part and the cause is remanded.

¶ 86. ANN WALSH BRADLEY, J. (*dissenting*). What happened on June 21, 1995, that transformed the Previant firm's action from a meritorious case into a frivolous claim? The majority fails to clearly answer the question. It nevertheless concludes that on that date, only six weeks after the case was commenced, the Previant firm's suit was so completely lacking merit that "*no* reasonable basis exist[ed] for a claim."

¶ 87. Could it be, as the majority seemingly suggests, that the filing of a request for the production of documents in this case renders it devoid of merit? Is the majority really contending that it is frivolous for a party to pursue formal discovery without first "avail[ing] itself of information that was available without discovery?" Majority op. at 571. The majority's answers to both questions appear to be "yes."

¶ 88. At the outset, it is important to remember that the entire life of this action spanned nine months: the Previant firm filed the action on May 9, 1995, and indicated that it wished to dismiss the action on Febru-

ary 28, 1996. Prior to filing the action, the Previant firm knew that several female employees of JFI had given birth to children with birth defects, that the JFI plant had frequent ammonia leaks, and that excessive amounts of carbon dioxide often existed in the work environment. It knew that the physician of one of the pregnant employees had indicated that the chemicals at JFI could well have caused the birth defects of that employee's child. The Previant firm was informed that a management employee of JFI had indicated that the company knew of the dangers at the plant and attempted a cover up. A consultant advised the Previant firm that in order to prove that the toxic chemicals caused the birth defects it needed to obtain information concerning the employees' level of exposure to the chemicals.

¶ 89. The Previant firm filed suit and six weeks later requested documents. JFI would not release the requested documents without a confidentiality agreement. After months of wrangling with JFI over the confidentiality agreement, on December 8, 1995, the court signed the order and the Previant firm had access to those documents numbering well over 200,000.[1] On January 31 and February 1, 1996, the Previant firm inspected those documents.

¶ 90. Through that discovery, the Previant firm found documents suggesting that JFI suspected that its chemicals might adversely affect pregnancy. It discovered that almost two years prior to the commencement of the suit, JFI had hired a researcher

---

[1] This is not to say that the case sat idle until that time. From the middle of June until early November, both the Previant firm and JFI debated, weekly at times, issues related to venue, substitution of judges, third-party complaints, and other various items common to complex litigation.

at the University of Minnesota to run a computerized "Med-line" search of articles related to "Spina Bifida and Carbon Dioxide Exposure or Teratogenic Effects of Carbon Dioxide." The documents revealed that JFI produced a "Safety Facts Sheet" indicating that "[c]oncentrations [of carbon dioxide] over 50,000 [parts per million] can deplete oxygen levels which could impact the health of unborn children." It discovered that after an ammonia leak, a JFI supervisor kept any pregnant employees "out of the area for the rest of the evening as a precautionary measure." Significantly it found that a doctor of another pregnant employee had written to JFI informing it that the pregnant employee should discontinue working because ammonia is "harmful to adults" and "is similarly harmful to fetuses whose mothers breathe excessive amounts of the gas."

¶ 91. The Previant firm also learned, after talking with two consultants, that in order to establish causation it would need to obtain very expensive epidemiological studies. The clients did not have the desire to pursue this massive undertaking. Recognizing that without the epidemiological studies, the chance of ultimate success was slim, they instead chose to voluntarily dismiss their suit.

¶ 92. I conclude that an independent review of these facts demonstrates that the suit was not frivolous.[2] JFI, by its actions, apparently agrees with me.

---

[2] As we reiterated earlier this term, frivolousness is a mixed question of law and fact. *Juneau County v. Courthouse Employees*, 221 Wis. 2d 630, 639, 585 N.W.2d 587 (1998). While a circuit court's findings of fact are not upset unless they are clearly erroneous, whether those facts constitute frivolousness is a question of law that we review independently of the determinations of the circuit court. *Id.*

¶ 93. JFI expended nearly $1 million to defend against the Previant firm's action. Quite simply, it is incongruous for JFI to assert that it is reasonable to spend that amount of money defending the action while at the same time claiming that the claim has no merit. As the Eighth Circuit stated, "On the face of it, there is something very inconsistent with the assertion that the plaintiffs filed a patently frivolous complaint meriting sanctions. . .and contending that it took 279.10 or even 179.10 hours of legal work in order to reveal what defendants contend is obvious." *Kirk Capitol Corp. v. Bailey*, 16 F.3d 1485, 1491 (8th Cir. 1994) (cited by majority op. at 579). Hours of 179 to 279 constitute only pocket change in comparison to the total number of hours billed by JFI's attorneys in this case—over 2,500. The "inconsistency" increases exponentially as the hours increase arithmetically.

¶ 94. JFI now contends that as of July 1995, two months after the action was filed, it was of the opinion this action was frivolous. Yet, it never raised that issue in its answer or any responsive pleadings. Instead, it waited until the plaintiffs announced their intent to voluntarily dismiss this action before it raised the specter of seeking sanctions. All the while, it continued to spend seemingly unlimited resources to defend an action that it deemed frivolous.

¶ 95. JFI cannot spend unlimited resources to defend a frivolous action without those expenditures becoming frivolous as well. Just how does one rack up over $750,000 in bills in nine months? The attorneys fees claimed by JFI exceeded $45,000 for the pleadings alone. It claimed $43,000 in LEXIS and Westlaw research expenses, over and above the $107,000 in attorneys fees for research.

¶ 96. As further detailed below, I agree with the majority that the fees and expenses submitted by JFI are excessive. Majority op. at 579–80. However, the fees and expenses reveal that JFI took this claim seriously because the claim *was* serious. JFI attacked this case as if it had merit because the case *was* meritorious. This case was not commenced frivolously; it was not continued frivolously.

¶ 97. The majority agrees with part of that statement. On the one hand it determines that the suit was not frivolous when filed on May 9, 1995. On the other hand it determines that it was frivolous on June 21, 1995—43 days, or a little over six weeks, from filing.

¶ 98. Six weeks disappear with the blink of an eye in ordinary civil litigation. Complex toxic tort cases with multiple defendants only elongate this process. *See* 1 *A Guide to Toxic Torts*, § 2.01 (Matthew Bender 1999). Such cases are expensive to litigate and, as a necessary corollary, typically of long duration. *See, e.g., In re Joint E. & S. Dists. Asbestos Litig.*, 52 F.3d 1124 (2d Cir. 1995) (six years); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223 (E.D.N.Y. 1985), *aff'd* 818 F.2d 187 (2d Cir. 1987) (six years); *Ayers v. Township of Jackson*, 525 A.2d 287, 292 (N.J. 1987) (nine years). Yet, on June 21, 1995, six weeks after filing the complaint and 22 days before JFI even answered the complaint (July 13, 1995), the majority declares, as a matter of law, that the lawsuit became utterly meritless.

¶ 99. Not only is six weeks a blink of the eye in the life of a toxic tort case, six weeks is a wholly inadequate period of time for plaintiffs' counsel to gather and build what is needed to prove causation in a toxic tort case. Causation is the core of a toxic tort case and, by its nature, is riddled with special and complex problems of

proof. 2 *A Guide to Toxic Torts*, ch. 15 (Matthew Bender 1999) ("Special Issues of Cause and Effect in the Defense of a Toxic Tort Case"). Proving causation in a toxic tort case normally requires evidence of the level, date, and circumstances of the chemical exposure, as well as the observed effects of exposure on each of the individual plaintiffs. 2 *A Guide to Toxic Torts*, § 15.01[6]. All of this proof of causal relationship must be shown in addition to some form of scientific evidence. Yet, according to the majority, plaintiffs' counsel must assemble all of this proof in a six-week period of time.

¶ 100. Setting aside the folly of finding this suit frivolous after only six weeks and before issue was even joined, the majority's rationale underlying its conclusion does not withstand scrutiny. The majority's holding, as I understand it, is that the Previant firm's suit became frivolous on June 21, 1995, because on that date the Previant firm served its second request for the production of documents on JFI.[3] Majority op. at 575. This ordinary act of formal discovery became egregious, the majority maintains, for two reasons: (1) the Previant firm should not have relied upon the advice of Dr. Dahir who suggested that the Previant firm needed to know the levels of toxic exposure before it could secure an expert opinion on causation; and (2) the Previant firm could have obtained the same information from OSHA without discovery. Majority op. at 570–71.

¶ 101. It is not entirely clear why Dr. Dahir's suggestion is relevant to the majority's conclusions. The Previant firm consulted Dr. Dahir prior to filing the

---

[3] Also on that date, the Previant firm served JFI notice of a deposition of one of its officials and JFI requested a confidentiality order.

suit. This explains why the circuit court's findings regarding Dr. Dahir were in regard to the frivolous *filing* of the suit (a conclusion, of course, with which the majority disagrees), but it does not explain why the majority extrapolates them to the frivolous *continuance* of the suit.

¶ 102. In any event, it is elementary that in order to determine whether exposure to a toxic chemical is harmful, it is necessary to know the level or amount of exposure. As this court has previously stated, even normally "benign" chemicals can become harmful if released in excessive amounts. *See Donaldson v. Urban Land Interests, Inc.*, 211 Wis. 2d 224, 233, 564 N.W.2d 728 (1997); *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992). The majority's attack on Dr. Dahir's opinion, his experience, and his training creates confusion not illumination. It really provides no support for the majority's argument.

¶ 103. Next, the majority suggests that the continuation of the action is frivolous because the Previant firm could have obtained the requested information from OSHA without formal discovery. Majority op. at 570–71. I am bewildered both by the factual and by the legal assumptions that underlie the majority's assertion. Factually it is not, as the majority repeatedly contends, "undisputed that this information was available to the Previant firm short of discovery." Majority op. at 571. To the contrary, at oral argument the Previant firm maintained that it did check the OSHA records related to JFI. Additionally, the Previant firm argued that such information was of only marginal assistance because the information is limited to what OSHA requires a company to report. These records did

not provide all the information the Previant firm needed.

¶ 104. More importantly, legally I am aware of no rule of civil procedure in this state that imposes a duty on a plaintiff to exhaust outside sources of information before seeking that information from an opposing party through formal discovery. Certainly there is no such rule imposed by Wis. Stat. ch. 804. Actually such a rule is in conflict with § 804.01(2)(a) which states that "[p]arties may obtain discovery regarding any matter, not privileged. . . ." The majority does not even make a serious attempt to justify its bald assertion that formal discovery on a subject is sanctionable until every alternative source has been exhausted, as its discussion on the matter is bereft of any cited authority on that principle.[4] *See* majority op. at 570–71.

¶ 105. Instead, the majority hangs its hat on what it terms the circuit court's conclusion that "the information the Previant firm claims it needed prior to

---

[4] The majority castigates the Previant firm's actions as "fil[ing] first and ask[ing] questions later." Majority op. at 569. It is difficult to reconcile this statement with the majority's earlier conclusion that the Previant firm had a reasonable basis in fact and law to file the action. Majority op. at 562.

The majority suggests that it does not hold "that as a matter of course a plaintiff must exhaust outside sources of information before embarking on formal discovery." Majority op. at 568. Yet that assertion is contradicted by the majority's next words: "we do believe that a plaintiff may not rely on formal discovery to establish the factual basis of its cause of action." Majority op. at 568.

The majority's problem, of course, is that it has already held that the plaintiff *did* establish the "factual basis of its cause of action" at the time of filing. Under the rules of civil procedure, unlocking that door permits a plaintiff to enter the world of formal discovery.

acquiring an expert opinion. . .could have been acquired without discovery." Majority op. at 570. That is not what the circuit court said. Rather the circuit court found that "[i]t was unnecessary, and therefore unjustified, *for the Previant Firm to sue JFI to obtain this information*" because the documents existed at OSHA. *Quoted by* majority op. at 565–66 (emphasis added). But the majority has already concluded (contrary to the circuit court) that the Previant firm acted permissibly in filing its suit. Majority op. at 562. Having permissibly filed suit, the Previant firm did not need to access the documents from OSHA; it was permitted by the Rules of Civil Procedure to get them directly from JFI.

¶ 106. Similarly, the majority takes a rather parochial approach to discovery. As the Previant firm's lead attorney indicated at the hearing, the Previant firm suspected that JFI, as a multi-million dollar corporation, might have conducted research on its chemicals and their health effects on employees. This type of information would never have appeared in an OSHA file.

¶ 107. The Previant firm was seeking discovery for more diffuse reasons than just causation. The Previant firm needed access to JFI's records in order to have a more complete picture of what JFI knew, when it knew it, and what it had done with that knowledge.

¶ 108. Having found little success with its "Dr. Dahir" and "OSHA" arguments, the majority resorts to contending that the Previant firm presented disingenuous arguments to the court. The majority rejects the Previant firm's claim that it needed the discovery to obtain expert opinions because "once [the Previant firm] did contact experts, it did not provide those

experts any of the information it obtained as a result of discovery." Majority op. at 573.

¶ 109. While the majority may be technically correct, it fails to recognize the effect that the confidentiality agreement had on the Previant firm's actions. As part of the confidentiality agreement governing the disclosure of JFI's records, the Previant firm had to "advise [JFI] of the identity of the expert and/or advisor to whom disclosure is contemplated." The anonymity provided to consultants by the rules of civil procedure was eviscerated by the confidentiality agreement. *See Fredrickson v. Louisville Ladder Co.*, 52 Wis. 2d 776, 782, 191 N.W.2d 193 (1971); *Wisconsin Discovery Law & Practice*, § 8.11; Patricia Graczyk, *The New Wisconsin Rules of Civil Procedure, Chapter 804*, 59 Marq. L. Rev. 463, 474–75 (1976).

¶ 110. Had the Previant firm done what the majority would seem to require—"provide those experts. . .the information it obtained as a result of discovery"—the identity of its consultants would have been revealed to JFI. Following the requirement of the majority would unfairly force the Previant firm's hand.

¶ 111. Tellingly, the majority has nothing to say about the effect that the confidentiality agreement had on the Previant firm's decision not to show its consultants documents obtained from JFI. There was no duplicity on the part of Previant, only cautious lawyering.[5] By suggesting otherwise, the majority further

---

[5] To the extent that the majority implies that the Previant firm had no discussions with its consultants about what it found in JFI's records, that assertion is not supported by the record. The circuit court's findings of fact on this issue stated only that the Previant firm's consultants were not "shown any of the documents produced by JFI."

exhibits that its conclusion is inconsistent with the facts and law guiding this case.

¶ 112. Finally, I note that in remanding this case to the circuit court for a determination of the reasonable amount of fees and expenses, the majority correctly questions whether the defendants have fulfilled their duty to mitigate those fees and expenses. Majority op. at 579. As discussed above and as noted in the majority opinion, it is difficult to "square JFI's varying views that causation was impossible to prove as a matter of law and the need to expend the hundreds of thousands of dollars that JFI expended in defending this suit." Majority op. at 579 (citing *Kirk Capitol Corp.*, 16 F.3d at 1491). It is inconsistent for JFI to contend that continuing the lawsuit is patently frivolous while at the same time giving credence to the suit's merit by spending excessive sums in JFI's defense.

¶ 113. The majority also correctly notes in its opinion that the plaintiffs allege two claims each against JFI, one in common law negligence and the other under the safe place statute. Majority op. at 543. The majority, however, declines to determine whether the safe place claims were frivolously continued and makes a conclusion only with regard to the common law negligence claims. Majority op. at 573.

¶ 114. As a result, upon remand JFI will have the burden of proving what amounts of its claimed fees and expenses are attributable only to the "frivolous" common law negligence claims. No fees and expenses may be assessed for the defense of the safe place claims. Any doubt as to whether an amount is attributable only to the common law negligence claims should be resolved in favor of the Previant firm. *See Juneau County*, 221 Wis. 2d at 640.

¶ 115. Upon remand and consistent with the majority opinion, the circuit court should deduct from the requested amount all fees and expenses incurred prior to June 21, 1995. Next, it should allow fees and expenses that are attributable only to the "frivolous" continuation of the common law claims. Finally, in fashioning the award, the circuit court should consider JFI's duty of mitigation. As the majority quoted, "A party having vigorously resisted a baseless claim may therefore find that the court, in making an award, will consider its expenditures to have been excessive." Majority op. at 578 (citing *Brown v. Federation of State Medical Boards of U.S.*, 830 F.2d 1429, 1439 (7th Cir. 1987)).

¶ 116. In sum, the majority is correct to conclude that the Previant firm's action was not frivolous when it was commenced. However, its conclusion that the Previant firm continued a frivolous action as of June 21, 1995, six short weeks into the litigation, is meritless. Accordingly, I dissent.

¶ 117. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this opinion.